(117 App. **Div. 130**)

## WARD v. CITY TRUST CO. OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department. January 11, 1907)

1. CORPORATIONS—DEALINGS WITH OFFICERS—DUTY TO MAKE INQUIRY.

Where a person dealing with an officer of a corporation should have made inquiry as to the authority the corporation had conferred on the officer, he was bound by the result of a diligent inquiry; and, if the inquiry would have led to the discovery of facts justifying the dealing had, he should have had the benefit thereof, though no inquiry was made.

2. BILLS AND NOTES—TRANSFERS—HOLDERS FOR VALUE.

A person taking commercial paper in extinguishment of a debt, surrendering the note of his debtor and the collateral, whether before or after the maturity of the debt, is a holder for value.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 7, Bills and Notes, § 932.]

3. SAME—GOOD FAITH OF TRANSFEREE.

A trust company made a loan to the owners of the stock of a corporation, taking their note therefor and the stock as collateral. Thereafter the affairs of the corporation were placed in the control of one of the stockholders, who negotiated a loan from a bank, receiving a draft, drawn to the order of the corporation, for the amount of the loan from the trust company. The stockholder indorsed the paper, in the name of the corporation, as president and general manager, to the trust company, and it accepted it in payment of its loan to the stockholders, surrendering the note and the stock. *Held*, that the trust company acquired title to the draft in good faith.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 7, Bills and Notes, §§ 924–932.]

4. CORPORATIONS—CAPITAL TRUST FUND FOR CREDITORS.

The capital stock of a corporation is a trust fund for the benefit of its creditors.

5. BILLS AND NOTES—BONA FIDE PURCHASERS—TITLE OF TRANSFEREE.

The transferee of the personal or real assets of a corporation acquires only the title of the corporation, and, if no consideration for the transfer moves to the corporation, the title of the transferee may be impeached by creditors; but a transferee of commercial paper of a corporation acquires, not the actual title of the corporation, but its apparent right to make a transfer.

6. SAME—NOTICE OF WANT OF POWER IN TRANSFERRER.

Under Negotiable Instrument Law, Laws 1897, p. 732, c. 612, § 95, declaring that, to constitute notice of an infirmity in the title of the person negotiating an instrument, the person to whom it is negotiated must have had actual knowledge of the infirmity, etc., the notice of a want of power in an officer of a corporation to transfer commercial paper held by it must, to render the transfer ineffectual, be knowledge on the part of the transferee of such facts that will make his act in taking the paper amount to bad faith.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 7, Bills and Notes, §§ 818–824.]

7. SAME.

Evidence examined, and *held*, that a transferee of commercial paper of a corporation did not have knowledge of such facts as rendered his action in taking the paper equivalent to bad faith.

8. CORPORATIONS—TRANSFER OF ASSETS—VALIDITY AS TO CREDITORS—KNOWLEDGE BY TRANSFEREE OF FRAUD.

The title of a transferee of corporate assets can only be impeached on the ground of fraud against the creditors of the corporation by proof of knowledge on the part of the transferee of intended fraud, or of such

facts as will authorize the court to hold that the transferee acted in bad faith.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 2161.]

9. SAME.

A trust company loaned money to the owners of the capital stock of the corporation taking their note therefor and the stock as security. Thereafter the affairs of the corporation were placed in the control of one of the stockholders, who negotiated a loan from a bank, receiving a draft drawn to the order of the corporation for the amount of the loan from the trust company. The stockholder indorsed the draft, in the name of the corporation, as president and general manager, to the trust company, and it accepted it in payment of its loan, surrendering the note and stock. *Held*, that the title of the trust company to the draft could not be attacked on the ground that the payment thereof rendered the corporation insolvent, where the company had no information leading it to believe that the corporation was thereby made insolvent.

Scott and McLaughlin, JJ., dissenting.

Appeal from Judgment on Report of Referee.

Action by Charles M. R. Ward against the City Trust Company of New York and another. From a judgment dismissing the complaint, entered on the report of a referee, plaintiff appeals. Affirmed, on opinion of referee.

The opinion of William G. Choate, referee, is as follows:

This is an action brought by a judgment creditor of the Hartman Manufacturing Company, a corporation organized under the laws of Pennsylvania, against that company and the City Trust Company. The judgment creditor's execution having been returned unsatisfied, he seeks to recover from the City Trust Company $125,000, with interest from August 2, 1901, on the ground that $125,000 of the money of the Hartman Company was used by its president, Frank A. Umsted, on August 2, 1901, to pay a personal debt to the City Trust Company. On March 27, 1901, the City Trust Company loaned to Umsted and one William A. Kiefer the sum of $125,000, taking from Umsted and Kiefer their personal note for that amount, dated March 21, 1901, and maturing September 21, 1901. Umsted and Kiefer were the owners of all the capital stock of the Hartman Company, $150,000 common stock and $100,000 preferred stock, and the certificates for this stock were indorsed over to and deposited with the City Trust Company as security for the loan. For the further protection of the trust company the controlling interest in this stock was put in the name of one of the officers of the trust company, and one of its directors, Elverton R. Chapman, and John F. Plummer were made members of the board of directors of the Hartman Company to represent the interests of the trust company until the loan was paid. Chapman, who was a member of the executive committee, as well as a director, of the trust company, had investigated the proposed loan and recommended it. A premium or commission of $5,000, in addition to interest, was offered by the borrowers, and Chapman offered to the trust company either to guaranty the loan and take the commission or to give the trust company the benefit of the commission. The trust company preferred the latter course, and took the commission, in addition to interest. The trust company was informed at the time of the transaction that this loan was to enable Umsted and Kiefer to pay a balance due on the stock; the whole price paid by them being, as was stated, $350,000. With a part of the money thus borrowed Umsted paid $110,000, the amount which he had agreed to pay to the former owners of the stock for their interest, and on the 28th of March, the day after this loan, he took charge of the company's affairs and held a meeting of the board of directors. He was elected president, and Kiefer was elected secretary and treasurer. Plummer, who at the same time became a member of the board, was elected vice president. Before the loan became due Umsted applied to the trust

company for a further loan, either for himself or for the Hartman Company, and stated that one of his objects was to increase the capital stock of the company. The president of the trust company, who thought that a loan of this character was not one fairly within the proper business province of a trust company, but rather such a loan as should be obtained from a bank, was very willing that the loan should be paid off, and, knowing that Umsted could not increase the stock of the company without obtaining possession of the certificates of stock which were pledged with the trust company, refused to loan any more money, but consented that Umsted should pay off the loan before maturity. Accordingly Umsted negotiated with the Hanover National Bank a loan on the credit of the Hartman Manufacturing Company for $200,000, and obtained from the Hanover National Bank a draft for $125,000, payable to the order of the Hartman Company. He took this draft to the City Trust Company, and indorsed it in the name of the Hartman Manufacturing Company, by "F. A. Umsted, Pres't. & Gen'l Mangr." The trust company accepted this draft, thus indorsed, in payment of the debt of Umsted and Kiefer, and surrendered to Umsted their note and the certificates of the capital stock of the Hartman Company on the 2d of August, 1901; and it is this sum of $125,000, which the plaintiff claims the City Trust Company, knew to be the money of the Hartman Company, which the plaintiff seeks to recover in this action.

A recovery is sought on three grounds: (1) That the use of the money of the corporation by Umsted, president and general manager, was without the consent of the corporation. (2) That by this transaction, diverting, as it is claimed, the funds of the company to the private use of Umsted and Kiefer, the assets of the company were reduced below the amount of its authorized capital stock, and that the corporation itself had no authority or lawful right, being a going concern, thus to use its funds for the benefit of its stockholders or to divert them from corporate use. (3) That this payment or diversion of its funds from the use of the corporation, or for other than corporation purposes, made the corporation insolvent, and that the plaintiff could, therefore, recover the money so paid as a fraud upon the creditors.

1. As regards the first claim of the plaintiff, the trust company seems to have regarded Umsted and Kiefer as constituting in effect the corporation, they being, as the trust company was truly informed, the sole stockholders, and the president of the trust company seems to have acted upon the theory that as the sole owners of the stock they could lawfully dispose of the assets of the corporation; and it is a little difficult to see how, if the suit were brought by the Hartman Company itself, it could under these circumstances recover the money, except as the representative of creditors, and on the ground of a fraud upon them. The trust company made no inquiry as to any action on the part of the board of directors authorizing this disposition of the funds of the company by the president. It undoubtedly had notice, from the form of the draft of the Hanover National Bank, that the draft thus used in paying the debt of Umsted and Kiefer represented the money of the corporation. But, assuming that the trust company should have made inquiry in relation to what authority the corporation had given Umsted, if any, over the funds of the corporation, the trust company would be bound by the result of a reasonable, or, as some of the cases put it, a diligent, inquiry in regard to the authority of the president. If such inquiry would have led to the discovery of facts justifying the use made of the draft, then the defendant would have the benefit thereof. If such inquiry would have led to discovery of the fact that such use was unauthorized, then the defendant cannot justify such use as against the corporation; and even if the information that would thus have been obtained would have been erroneous, but such as the defendant might reasonably believe to be true, still the defendant may justify such use. Wilson v. Metropolitan E. R. Co., 120 N. Y. 145, 152, 24 N. E. 384, 17 Am. St. Rep. 625. This draft was commercial paper, and the trust company took it in discharge of a debt, and, so taking it, extinguished the debt and released the collaterals it held. It was, therefore, a holder for value. One who takes commercial paper in extinguishment of a debt, surrendering the note of his debtor and the collateral,

whether before or after the note becomes due, is a holder for value. Phœnix Ins. Co. v. Church, 81 N. Y. 218, 223, 224, 37 Am. Rep. 494; Leslie v. Bassett. 129 N. Y. 525, 29 N. E. 834; Youngs v. Lee, 12 N. Y. 551, 555; Cowing v. Altman, 71 N. Y. 435, 439, 27 Am. Rep. 70.

The question is, did the defendant acquire a good title to the draft? To do so, it must not only have given value, but also must have taken it in good faith. The trust company's actual good faith is not impugned, or at any rate there is no evidence which is entitled to any weight impugning the position of the officers of the trust company that they actually believed that they were entitled to receive this draft, although it represented the moneys of the corporation, in payment of the debt of the sole owners of the stock. In this case, however, if the trust company had made further inquiry with regard to the authority of Umsted to deal with the funds of the company, it would have discovered these facts: That from the 28th of March, when Umsted went into the control of the corporation, he took exclusive charge of the affairs of the company and managed its entire business, without any action or interference on the part of the board of directors, negotiating for and purchasing property, real and personal, borrowing money, and carrying on its business. That at a meeting of the board of directors held on the 28th of March, the following resolution was adopted: "That the president at once take charge of all the property and business of the company, and that all officers and employés of the company report to him and receive orders from him." And also the following resolution: "That all of the property, of whatever name and nature, of this corporation, be placed in charge of the president and general manager, and all checks, notes, contracts, and other obligations of the corporation be made and signed by the president, or by the secretary and treasurer, and that the signature of one or the other be required on all papers, contracts, and other documents executed by said corporation." That the board of directors then adjourned, and held no further meeting until after the payment of this loan on the 2d of August. Reasonable inquiry, therefore, on the part of the officers of the trust company, would have disclosed the fact that Umsted, the president, was during the interval between March 28th and August 2d permitted by the board of directors to do any business on behalf of the corporation which the corporation itself might have done by special order of the board; and when it is considered that Umsted, with his associate, Kiefer, were the sole owners of the stock, there is nothing strange or calculated to awaken suspicion in the fact that this absolute trust was reposed in Umsted. The question whether the rights of creditors might possibly be affected by the act comes more properly into discussion under other points; but on the mere question of Umsted's authority to dispose of the assets, even by distributing them among the stockholders, I am of opinion that, on the facts known to the trust company and the facts which they would have discovered on inquiry, they were justified in treating the acts of Umsted as the acts of the corporation.

The use which the president of the corporation made of this draft in discharging the note of himself and Kiefer, and getting into his possession the capital stock of the company, was a use which the corporation might properly have authorized for corporate purposes. It was not necessarily, from the point of view of the trust company, as suggested by the learned counsel for the plaintiff, a distribution in the nature of a dividend of the assets among the stockholders, Umsted and Kiefer. In fact the real purpose and effect of the discharge of this debt in this way, as between Umsted and Kiefer and the corporation, was not made known to the trust company, and this use of the draft may have been either of several corporate uses. It may have been the payment of a debt due from the corporation to Umsted and Kiefer for money advanced by them. It may have been a loan upon sufficient security from the corporation to them. It may have been a temporary use of the assets of the company under a special contract to accomplish some object for the benefit of the corporation. · It was not, therefore, necessarily, as is argued by the learned counsel for the plaintiff, although it appears in fact to have been a gift or diversion without consideration of the money of the

corporation to other than corporate uses. We may assume that the notice which the trust company had that the money was the money of the corporation from the form of the draft, put the defendant on inquiry as to the authority of Umsted thus to use the draft; that is, on inquiry as to whether the corporation consented thereto. It put the trust company on inquiry as to no other facts. If the corporation could put the money to this use, and it either appeared without inquiry, or would have appeared upon reasonable inquiry, that the corporation consented to the use of the money, then, on the principles of law applying to commercial paper, the defendant acquired a good title to the draft. It was not bound to inquire further into the details of the arrangement between Umsted and the corporation that had given its consent to the use of the money; nor was it bound to suspect that, in making the use of the money which the corporation consented to, Umsted was intending some fraud upon the corporation. There was nothing in the prior dealings between Umsted and the trust company which suggested any fraud on his part. On the contrary, from all the evidence which the trust company had during the prior negotiations for the loan in March, and up to the time of the payment of this note, the trust company had every reason to believe, not only that the corporation was a prosperous and going concern, wih a good business, paying dividends, but that Umsted was a man of high personal and business character. Facts which put a holder or indorsee of commercial paper upon inquiry as to a possible defect of title put such holder or indorsee upon inquiry only in respect to that particular defect. The duty of inquiry extends no further than that defect. Such notice does not open a general duty of inquiry as to any other or any possible defects; and if the particular defect is removed or overcome, either by the information received at the time of the transaction or by the information which would have been received by reasonable inquiry, then the title of the holder is good.

It is, indeed, argued by the learned counsel for the defendant that this transaction of the surrender of the stock was in effect a purchase of the stock by the corporation. I am unable to find, however, in the evidence, any trace of such a transaction, or any evidence of the transaction being so understood by either of the parties. On the contrary, both parties appear to have understood that the stock was surrendered to the debtors, Umsted and Kiefer, as owners of the collateral, upon payment of their note. Nor can I find, as urged by the learned counsel for the defendant, that the subsequent use of the stock in being voted upon for the purpose of an increase of the capital, or its being transferred to a third party for the benefit of the creditors or of the corporation, through the intervention of Mr. Chapman, after it was discovered that the corporation was in bad financial condition, or its subsequent transfer to the receiver of the corporation for its benefit, in any way operates to make this surrender of the stock to Umsted and Kiefer a purchase by the corporation, or to estop in any way the plaintiff from maintaining this action, if otherwise he could maintain it. What was done with the stock after it was delivered to Umsted and Kiefer was done by them as owners, and not in any sense by the corporation. The final surrender of Umsted's interest in the stock seems to have been in consideration of a release of a claim of the creditors against his wife in respect to other property. These questions, however, like many other questions of fact and law that were fully and ably discussed on the trial and summing up of the case, are not material to the disposition of the main issues in the case, as I understand them.

2. It is, however, strenuously insisted on behalf of the plaintiff that this action can be maintained on the ground that by this use of the funds of the corporation to the amount of $125,000, without any consideration therefor inuring to the corporation itself, the remaining assets of the corporation were reduced in value below, and far below, the amount of its authorized capital stock, $250,000; that this was an act which the corporation itself could not lawfully do, because both by the law of New York and the law of Pennsylvania the capital stock, in the sense of its available assets to the authorized amount of the capital stock, is a trust fund for the benefit of its creditors, which the corporation cannot, while a going concern, dispose

of without consideration, and which it, therefore, cannot authorize any officer thus to dispose of. The principle of law thus invoked, that the capital stock of a corporation, in the sense above referred to, is a trust fund for the benefit of its creditors, which is jealously protected by courts of equity, is an undoubted rule for the prevention of fraud, which is enforced whenever it becomes properly applicable, and there seems to be no doubt that the law of Pennsylvania and the law of New York agree on this point. The leading case in New York seems to be the case of Bartlett v. Drew, 57 N. Y. 587, where the principle was enforced as against a stockholder who had received part of the capital, leaving the debts of the corporation unpaid. It was also followed in a similar case in Hastings v. Drew, 76 N. Y. 16. The rule was applied as to subscribers to stock who had not paid in full, in Wheeler v. Millar, 90 N. Y. 361; and it has been frequently applied as to third parties who have knowingly taken the assets for their own benefit, without consideration inuring to the corporation, and leaving the creditors unprovided for. Cole v. M. I. Co., 133 N. Y. 168, 30 N. E. 847, 28 Am. St. Rep. 615; Hurd v. N. Y. & C. Co., 167 N. Y. 95, 60 N. E. 327. In the case of Cole v. M. I. Co. Judge Finch thus states the rule: "As against the creditor the transfer to the Millerton Company was illegal and in fraud of his rights. The assets of a corporation are a trust fund for the payment of its debts. upon which the creditors have an equitable lien, both as against the stockholders and all transferees, except those purchasing in good faith and for value."

But the question of the title acquired by the transferee for value of commercial paper—in this case a negotiable draft belonging to the corporation —is quite different from the question of the title acquired generally by the assignee of the assets, personal or real, of the corporation. As to the latter, where the transferee is not in a position to claim the benefits of the holder of commercial paper, but is merely a vendee of real or personal property, the title which the vendee gets is ordinarily only the title of his vendor. And if his vendor is the corporation itself, and no consideration for the transfer moves to the corporation, then the title of the vendee may be impeached by the application of this principle, and certainly so if he has notice that the principle is violated; and such are most of the cases cited by the learned counsel for the plaintiff to sustain this branch of the case. But the question as to a transferee of commercial paper is not of the actual title the transferror had to convey, but what was his apparent right to make the transfer; and, if he had such an apparent right to make a transfer, it is no defect in the title of the transferee a holder for value and in good faith that the transferror is abusing a trust or committing a fraud, unless the transferee also has notice of such abuse of trust or intended fraud. The notice of a defect or want of power in the transferror, in the case supposed of the corporation, to make a valid transfer, must be knowledge of such facts on the part of the transferee that his action in taking the instrument amounted to bad faith. This principle, which was the declared rule of the courts in New York has now been made statutory law by the negotiable instruments law. Cheever v. Pittsburgh R. R. Co., 150 N. Y. 59, 44 N. E. 701, 34 L. R. A. 69, 55 Am. St. Rep. 646; American Exchange Nat. Bank v. N. Y. Belting Co., 148 N. Y. 698, 706, 43 N. E. 168; Canajoharie Nat. Bank v. Diefendorf, 123 N. Y. 202, 25 N. E. 402, 10 L. R. A. 676; Negotiable Instrument Law, Laws 1897, p. 732, c. 612, § 95.

In this case there was no notice of any such abuse of trust or fraud on the part of the corporation, or of Umsted, the president of the company, in the use of the draft in question, or any circumstances known to the defendant, which amount to such notice to the trust company that by this payment to Umsted and Kiefer the capital of the corporation was reduced below that required by the law of New York or of Pennsylvania to be kept intact for the benefit of creditors. As above stated, during all the negotiation the information received by the trust company, up to the time of the payment of this draft on the 2d of August, was in every way favorable to the corporation, and to its president personally. Even if it be assumed that the disposition made of the draft was not in any way for the benefit of the corporation, which for reasons above stated I think cannot be assumed as

a fact known to the defendant, the facts known to the officers of the trust company were not such as to suggest that the effect of this transfer of funds of the corporation to Umsted and Kiefer would leave the capital thus impaired. Much less was there on the part of the trust company any actual knowledge of facts which made their act in accepting the transfer of this draft an act of bad faith toward the corporation or its creditors in this respect. The facts relied upon by the plaintiff's counsel are not sufficient to constitute notice of this character.

Great importance is, by the learned counsel for the plaintiff, attached to the way in which the sum of $125,000, originally loaned to Umsted and Kiefer was divided up. It is argued that what happened at the time of the loan should have made the trust company aware that Umsted and Kiefer were paying only $110,000 for the stock, and that they were paying large and extraordinary commissions and other expenses to procure the loan; the argument being that such payment of commissions and the mode in which the money was distributed was notice that this was not an ordinary loan or business transaction, or one which a prosperous corporation would resort to, but a borrowing of money under such extraordinary terms and conditions as necessarily to excite suspicion. The circumstance, however, of the borrower dividing up the money borrowed into various sums for various purposes, is too common to excite remark. It is not a matter with which the lender has anything to do, and the fact, known to the trust company, that, in addition to interest at 6 per cent., the borrower was paying a commission of 4 per cent., was not, in my opinion, sufficient to excite suspicion. Beyond this there were no suspicious circumstances in the transaction known to the defendant.

The fact, also, that the trust company was aware that the corporation was borrowing large sums of money, at and before the time of this payment on the 2d of August, is insisted upon as notice of a circumstance which should have put the trust company on its guard or on inquiry. It is true, as shown by subsequent developments, that Umsted, for the company, borrowed of various banks during that period large sums of money, and it may be that his conduct of the business of the company, in respect to forming and carrying out plans for the enlargement of the business and the plant, was reckless and unwise; but the fact that he was able on the credit of the company to borrow large sums of money from the banks, which was partly within the knowledge of the trust company at the time, is, it seems to me, rather a fact making in favor of the company and of Umsted's credit than against it. So it is said that Chapman and Plummer were put on the directorate of the corporation to look after the interests of the trust company, and that, if the facts known to Chapman and Plummer should be deemed to be known to the trust company, the trust company would have been in possession of information which would have put it upon inquiry. The main facts known to Plummer and to Chapman and not fully known to the trust company were in relation to these borrowings by Umsted on behalf of the corporation. Those, however, were facts not discrediting, but enhancing, the credit of the corporation and of Umsted, tending to show prosperity, and in no wise, from the point of view of the trust company on the facts within its knowledge, tending to show recklessness, or improvidence, or a bad financial condition. Moreover, the real question being of the trust company's good faith, it is not perceived how the knowledge of Chapman or Plummer can be held to be the knowledge of the trust company.

On the question of fact whether this payment did deplete the assets of the company below the capital stock, I think, if it were material, or could avail the plaintiff, it must be found in his favor. The representations made by Umsted, at the time he negotiated the loan with the trust company in March, were grossly untrue with regard to the financial condition and prospects and resources of the corporation. Instead of giving $350,000 for the stock which was put up as collateral, as represented by him in a letter to the company, he was giving only $110,000. The condition of the company was by no means as good or prosperous as he caused the defendant trust company to believe. But these facts were only discovered by the trust

company long afterwards, and do not in any way tend to impugn the good faith of the officers of the trust company in taking this draft.

As regards this second point on which the plaintiff relies, I think, also, it substantially is a claim that this transfer was a fraud upon the creditors of the corporation, and I · think the same principle applies that applies in cases of alleged fraud against creditors of the vendor—that the title of the vendee can only be impeached upon proof of knowledge of the intended fraud, or of such facts that the transferee must be deemed to have acted in bad faith.

3. The final claim made by the plaintiff against the defendant is that this payment to Umsted and Kiefer made the corporation insolvent and unable to pay its debts, and on that ground that it was a fraud upon creditors. It is a sufficient answer to this claim that the defendant, the trust company, which gave value for the draft, had no knowledge or information leading it to believe or suspect that the corporation was thereby made insolvent. If it were material to the case, I think it must be found upon the evidence that this payment did make the corporation insolvent. Its financial condition at that particular time, 2d of August, as affected by this payment, from which, in fact, it received no valuable consideration, cannot with any certainty be shown or deduced from the books of the company or from the testimony. That the company was largely insolvent in November following is undoubtedly true, but the course taken by the banks, who were the principal or only creditors, in abruptly putting an end to Umsted's plans for the reorganization of the business of the company, and their act in procuring the appointment of a receiver, were calculated to turn solvency in August, if it existed, into insolvency in November. I think, however, it is true that there was very little substantial value in the assets over the liabilities in August, and the debts had already increased very largely over what they were in March, and, if it were a material point in the case, it must be found that this loss of $125,000 made the company insolvent. But, for the reasons stated under the former (second) point, the judgment must be for the defendant on this point, as the defendant had every reason to believe in the prosperity and solvency of the company, and was not informed of any facts at that time which should have led it to suspect insolvency.

4. Some other questions, of great importance in themselves, have been discussed · in this case; but, in my opinion, they are not material to the determination of the controlling questions. Some of them may, perhaps, be properly passed upon in the findings, if desired by the parties and deemed material by them.

Upon the whole case I am of opinion that the plaintiff's claim is not sustained, and that his complaint must be dismissed on the merits, with costs.

Argued before PATTERSON, P. J., and LAUGHLIN, HOUGHTON, McLAUGHLIN, and SCOTT, JJ.

T. Thacher, for appellant.
M. J. O'Brien, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of referee.

SCOTT, J. (dissenting). In the year 1901 Frank A. Umsted, a salesman in the employ of the Hartman Manufacturing Company, arranged to purchase the whole capital stock of the company, of the par value of $250,000, for the sum of $110,000. William A. Kiefer, a lawyer, became to some extent interested in the purchase. In order to procure the money necessary to complete the purchase, Umsted and Kiefer, by the most extravagant overstatements as to the business and condition of the company, the value of its assets, and the price which they had agreed to pay for the stock, induced the City Trust Company

of New York to loan them $125,000. As security for this loan the whole capital stock of the Hartman Company was deposited with the trust company, and placed in the name of one of its officers, and for the further protection of the trust company it was agreed that Elverton R. Chapman, a director of the trust company, and one John F. Plummer, who had been active and interested financially in negotiating the loan, should be made directors of the Hartman Company. It was thoroughly understood by the trust company, and all those who interested themselves concerning the loan, that it was a personal loan to Umsted and Kiefer, and was made to them in order that they might personally acquire the capital stock of the Hartman Company. Of the $125,000 loaned, $110,000 was paid to the vendors of the stock; the balance being used in payment of interest in advance, a bonus of $5,000 to the trust company, and certain commissions. In due course Umsted, Kiefer, Chapman, Plummer, and Elton, an employé of the company, were elected directors of the Hartman Company; Umsted being made president, Plummer vice president, and Kiefer secretary and treasurer. The directors met and adopted resolutions placing the property and business in charge of the president, and authorizing him, or the secretary and treasurer, to sign all notes, contracts, and other obligations of the company. After the adoption of these resolutions (to be considered more in detail hereafter) the board of directors adjourned, and held no further meeting until after the transaction which lies at the foundation of this action. Chapman went to Europe for a protracted visit, and Plummer apparently paid little attention to the affairs and business of the company, except to aid in the borrowing of large sums from banks in the city of New York. The loan by the City Trust Company to Umsted and Kiefer had been made for six months, and fell due September 21, 1901. Umsted and Kiefer conceived the project of acquiring other manufacturing properties, to be consolidated with the Hartman Company, and to this end they borrowed, with the assistance of Plummer and to some extent Chapman, considerable sums of money from New York banks. They also applied to the defendant trust company for an increase of its loan, but this was refused; the officers of the trust company being apparently uneasy about the loan, and much more willing to have it paid off, than to increase it. On August 1, 1901, the Hanover National Bank loaned to the Hartman Company $200,000. This loan was negotiated by Umsted, Plummer being present, and was made upon Umsted's statement that he and Kiefer had borrowed for the Hartman Company $125,000 from the City Trust Company upon a promissory note secured by the pledge of the capital stock of the said Hartman Company. He accordingly received from the Hanover National Bank a check upon itself, signed by its vice president, and drawn to the order of the Hartman Manufacturing Company, of Elwood, Pa., for the sum of $125,000. This check Umsted indorsed to the City Trust Company, signing the name of the Hartman Company, by himself as president and general manager. The City Trust Company accepted this check in payment of its loan to Umsted and Kiefer, and surrend-

ered the promissory note and the stock of the Hartman Company held as collateral thereto.

Shortly thereafter the Hartman Company, by action of its board of directors, increased the capital stock from $250,000 to $2,500,000, and the entire issue of the new stock was delivered to Umsted and Kiefer in substitution for the old stock held by them. On November 18, 1901, the Hartman Company failed to meet its obligations, and one of its notes went to protest, and steps were immediately taken by its creditors to secure themselves so far as possible. The various steps taken to this end it is unnecessary to recapitulate. A reorganization committee was appointed; and a board of directors was elected in the interest of the creditors. The claims against the company were assigned to the plaintiff, and all the property of the Hartman Company, except the claim against the City Trust Company, in suit here, was sold by order of the directors and bought by plaintiff for the sum of $238,000, which was credited proportionately in reduction of the several claims of the creditors. There still remained due $371,140.29, for which plaintiff recovered judgment against the Hartman Company, upon which execution was issued and returned unsatisfied, whereupon the plaintiff brought this action to recover the $125,000 loaned to the Hartman Company by the Hanover National Bank and diverted to the payment of the personal indebtedness of Umsted and Kiefer to the City Trust Company. The plaintiff appeals from a judgment in favor of the defendant trust company, entered upon the report of a referee.

Three important facts stand out prominently in the case. They are found by the referee, and are not disputed by the respondent. They are: First, that the loan to Umsted and Kiefer was a personal loan to them, and was understood by and known to the officers of the City Trust Company to be such; second, that the money with which the loan was paid off was the money of the Hartman Manufacturing Company, loaned to it upon its credit; third, that the form of the check whereby the loan of the City Trust Company was paid off constituted notice to the trust company that the money represented thereby was the property of the Hartman Manufacturing Company. These fundamental and admitted facts lie at the very root of plaintiff's claim. It is thus made to appear that the City Trust Company knew that it was accepting the money of the Hartman Company in payment of the personal indebtedness of Umsted and Kiefer, and was thus reaping the fruits of an apparent diversion of the funds of the Hartman Company. With this knowledge and notice it was at once put upon its inquiry, and if it chose to accept the money, as it did, without any inquiry at all, it so accepted it at its peril; and, if this use of the funds of the Hartman Company was in fact unauthorized, the trust company is liable to refund the amount to the corporation or its creditors. Rochester & C. T. R. Co. v. Paviour, 164 N. Y. 281, 58 N. E. 114, 52 L. R. A. 790. From this general proposition we do not understand that there is dissent either by the learned referee or the respondent.

It is urged, however, that there are reasons why this general rule is not applicable to the case at bar. It is said that, although the trust company should have inquired as to the authority of Umsted and

Kiefer, but did not do so, still the failure to make such inquiry will not prevent the respondent from now relying upon such facts as would have been disclosed if a reasonable and proper inquiry had been made. For this there is ample authority (Wilson v. Met. El., 120 N. Y. 145, 24 N. E. 384, 17 Am. St. Rep. 625), but the limitation of the rule must be strictly observed. Prima facie it is unlawful for an officer of a corporation to use its funds in payment of his personal obligations, and the known fact that an officer is so using the corporation's funds certainly raises no presumption that he is authorized to do so, but rather the contrary. The inquiry respecting his authority, therefore, is not whether there is anything forbidding such use, but whether, either by some act of the company or something in the relation between the officer and the company, there is anything which justifies such use; and it is not sufficient that the inquiry is merely formal and perfunctory, or addressed to some one not presumptively cognizant of the facts, or who may have an interest in misstating them. When the officers of the trust company were offered the Hartman Company's money in payment of the personal indebtedness of Umsted and Kiefer, they were called upon to make a reasonably careful and intelligent inquiry as to the authority for such an apparent diversion of the company's money. The place to look for such authority was the minutes of the board of directors, upon which the trust company had expressly stipulated that it should have two members to safeguard its interests. Such an inquiry would have disclosed the fact that such authority had never been given to the board, unless it could be spelled out of the following resolutions, adopted at the first meeting after Umsted and Kiefer had obtained control of the company:

"Resolved, that the president [Umsted] at once take charge of all the property and business of the company, and that all officers and employés report to him and receive orders from him.

"Resolved, that all the property, of whatever name and nature, of the corporation, be placed in charge of the president and general manager, and all checks, notes, contracts, and other obligations of the corporation be made and signed by the president and general manager, or by the secretary and treasurer, and that the signature of one or the other be required on all papers, contracts, and other documents executed by the corporation."

These resolutions, which are to be read together, certainly gave to Umsted the most complete control over the business of the corporation, and over its funds and property in connection with its business; but there is nothing whatever in the language of the resolutions, or in the intent, so far as it can be derived from the language, to justify the conclusion that the directors had authorized Umsted and Kiefer to divert the company's money to the payment of their own personal obligations. Certainly there is no such apparent authority, as was given to the president of the defendant in Bank of New York v. Am. Dock & Trust Co., 143 N. Y. 559, 38 N. E. 713, to sign warehouse receipts, or to the defendant in Rankin v. Bush, 93 App. Div. 181, 87 N. Y. Supp. 539, to certify checks. If, then, the trust company had made proper inquiry, they would have found in the minutes of the board of directors no justification for the use of the Hartman Company's money for the payment of the debts of Umsted and Kiefer, and so they could

have found no such authority anywhere, for the fact was that no such authority existed, and no amount or extent of inquiry could have disclosed any. We are therefore unable to find any foundation for the view expressed by the learned referee that the City Trust Company is to be considered as having received the money of the Hartman Company in what is known to the law as good faith. That its officers were guilty of actual, intentional fraud is not claimed; but it is clear that they were guilty of a legal fraud upon the Hartman Company and its creditors, for it appears that the payment of $125,000 to the trust company largely impaired the capital of the Hartman Company, which then owed various banks upwards of $386,000, and in effect rendered it insolvent. Unless there is something in the present case exempting it from the general rule, the facts as thus far stated required a judgment for the plaintiff. Rochester & C. T. R. Co. v. Paviour, supra; Gerard v. McCormick, 130 N. Y. 261, 29 N. E. 115, 14 L. R. A. 234; Cohnfeld v. Tannenbaum, 176 N. Y. 126, 68 N. E. 141, 98 Am. St. Rep. 653.

That the payment was made by what is known as a "cashier's check" is of no significance, except that, as already noted, its very form conveyed notice of the apparent diversion.

It is argued that the act of Umsted and Kiefer was afterwards ratified by the Hartman Company. It seems to be more than doubtful whether or not, under the circumstances, the company could lawfully and effectually, as against its creditors have ratified an act which impaired its capital. However this may be, there is no evidence of ratification; for it does not appear that any director, save Umsted and Kiefer, knew of the diversion.

It is also strongly urged upon us that the Hartman Company was what is known as a "one man corporation," and that, owing to this fact, the trust company was justified in treating Umsted and Kiefer, the owners of the whole capital stock, as if they were in fact the company, and was also justified in assuming that they had authority to deal with the funds and assets of the company as their own. Undoubtedly there are cases wherein the assent of all the stockholders of a corporation is to be taken, as against them, as the assent of the corporation itself; for it would be manifestly unjust for the stockholders to repudiate, in their corporate capacity and for their own benefit, that which they assented to as individuals. But this principle is applicable only, and is applied only, where there are no interests to be considered except those of assenting stockholders, and can have no application where the rights of nonassenting creditors are concerned. In Little v. Garabrandt. 90 Hun, 404, 35 N. Y. Supp. 689, affirmed 153 N. Y. 661, 48 N. E. 1105, which was an action by a receiver of a corporation, the court said:

"In his capacity as trustee of the corporation he would not be precluded from a successful prosecution of the action, because of the assent of all of the stockholders to the use of the funds for purposes outside of the business of the corporation, provided it were the fact that the corporation was insolvent at the time such payment was made."

The referee has expressly found that the diversion of the $125,000 not only impaired the capital of the Hartman Company, but rendered

it insolvent.   Ordinarily a corporation can act only through its directors, and it is only under special and unusual conditions that the assent of the individual stockholders may be taken in place of action by the directors, and certainly, when the rights of creditors intervene, the individual stockholders cannot make a disposition of the corporate funds which the directors, as such, could not lawfully make.   Primarily the capital of a corporation is held for the protection of its creditors, and impressed with a trust in their behalf, and the directors cannot lawfully, nor can the stockholders, divert the funds of a corporation to the individual use of its members, if thereby the capital is impaired and the corporation rendered insolvent.   Hurd v. N. Y. & C. Steam Laundry Co., 167 N. Y. 89, 60 N. E. 327; Germania Safety Valve & Trust Co. v. Boynton, 71 Fed. 797, 19 C. C. A. 118; In re Prospect Worsted Mills (D. C.) 126 Fed. 1011; Nat. Trust Co. v. Miller, 33 N. J. Eq. 155.

It is no answer to say that the trust company had no knowledge or notice that the Hartman Company had other creditors, or that the diversion of the $125,000 would impair its capital.   It was bound to inquire.   If it chose to treat Umsted and Kiefer as being in fact the corporation, and to rely upon their authority to divert the company's funds, as a substitute for the authority of the corporation expressed in the usual and customary way, it acted at its peril, not, perhaps, as against the stockholders with whom it was dealing, but as against existing creditors.   It had carefully stipulated for representation in the board of directors, thereby securing a source from which it could gain information as to the affairs and condition of the company, and yet neglected to resort to that source of information when an unusual and suspicious situation was presented.   Because it willfully closed its eyes and refused to make any inquiry, it cannot now escape liability because it did not know that which an inquiry would have made apparent.

For these reasons, the judgment appealed from should be reversed, and a new trial granted, with costs to appellant to abide the event.

McLAUGHLIN, J., concurs.