TITLE GUARANTEE & TRUST CO. v. PAM.

(Supreme Court, Trial Term, New York County.   October 4, 1915.)

1. CONTRACTS ⊗⟞280—CONSTRUCTION COMPANY—SKILL REQUIRED—BREACH—
   QUANTUM MERUIT.
   Where one contracts with a construction company to do work at cost
   and a percentage, he can expect the same skill and ability on the work
   as would be given where the contractor must do the work at less than the
   contract price to secure its profit, especially where the contractor refuses
   to allow the owner's inspection of the work; and if the work is done in
   reckless disregard of its obligation, the contractor can recover only the
   reasonable value of the work, any loss due to inefficiency of its employés
   properly falling on the company.

   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1249–1280;
   Dec. Dig. ⊗⟞280.]

2. BILLS AND NOTES ⊗⟞363—HOLDERS IN DUE COURSE—RIGHTS.
   A holder in due course of notes in suit can recover their face value,
   with interest, but if not in due course, only the amount actually due on
   them.

   [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 790, 791,
   960, 962; Dec. Dig. ⊗⟞363.]

3. BILLS AND NOTES ⊗⟞318—NEGOTIATION—BREACH OF FAITH.
   Where the defendant gave his notes to a construction company for
   work done and materials furnished under an express agreement that he
   should investigate the work, and any allowances due him as shown by
   his investigation would then be deducted from the notes, they were sub-
   ject to all claims and defenses, and negotiation prior to the adjustment
   was in breach of faith, and the title to the notes defective, as provided
   by Negotiable Instruments Law (Consol. Laws, c. 38) § 94.

   [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 754; Dec.
   Dig. ⊗⟞318.]

4. BILLS AND NOTES ⊗⟞497—HOLDERS IN DUE COURSE—BURDEN OF PROOF.
   Under Negotiable Instruments Law (Consol. Laws, c. 38) § 91, requiring
   one claiming to be a holder in due course to show that he took the note
   without notice of any infirmity or defective title of the one negotiating
   it, the burden of proof is constantly on him to show that he gave value
   and had no notice of defects, although the burden of going forward does
   shift.

   [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1448,
   1675–1681, 1683–1687; Dec. Dig. ⊗⟞497.]

5. BANKS AND BANKING ⊗⟞116—OFFICERS—NOTICE—HOLDERS IN DUE COURSE.
   Relations of a construction company, the assignor of notes in suit, and
   a bank, the assignee, because of interlocking directorates and ownership
   of stock, held to impute constructive notice to the bank, through the
   knowledge of its officers, of defects in the construction company's title
   to the notes, so that the bank was not a holder in due course.

   [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 282–
   287; Dec. Dig. ⊗⟞116.]

6. BILLS AND NOTES ⊗⟞525—HOLDERS IN DUE COURSE—NOTICE—EVIDENCE.
   Evidence in an action on notes by the assignee held to show actual
   notice to it of defective title in the assignor, so that it was not a holder
   in due course.

   [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1832–
   1839; Dec. Dig. ⊗⟞525.]

⊗⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. PLEADING ☞144—SET-OFF—FAILURE TO PLEAD—EFFECT.

The defendant, in an action on notes claiming fraud in their negotiation, cannot also have damages for delay in the work for which they were given, where he fails to plead in his answer the facts as to the delay and the set-off prayed for.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 293; Dec. Dig. ☞144.]

8. BILLS AND NOTES ☞530—UNLIQUIDATED AMOUNT—INTEREST.

Where notes are given under an agreement that the work for which they are given shall be investigated and any allowances found due thereon made, the actual amount due being unliquidated, and the payee then refused an adjustment, he cannot collect interest after the date on which the investigation concluded, and adjustment and liquidation might have been had.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1941-1944; Dec. Dig. ☞530.]

Action by the Title Guarantee & Trust Company against Max Pam. Judgment for plaintiff in part.

Harold Swain and Morgan J. O'Brien, both of New York City, for plaintiff.

Edmund L. Mooney, Francis S. Bangs, and William H. Hamilton, all of New York City, for defendant.

PAGE, J. This is an action on two promissory notes made by the defendant to the Thompson Starrett Company on November 1, 1912, payable in one year, respectively, for the principal sum of $96,733.52 and $3,094.63, bearing interest at the rate of 6 per cent., both of which were discounted with the plaintiff on December 7, 1912. At the date of discount plaintiff credited the account of Thompson Starrett Company with the amount of said notes less discount. The larger of the two notes was given in renewal of certain other notes made by the defendant to the Thompson Starrett Company and with the exception of one note of $35,150.04 discounted with the plaintiff. The preceding notes that were so discounted were paid by the Thompson Starrett Company at their maturity on November 1, 1912, and until December 7, 1912, the plaintiff held no notes of the defendant. The plaintiff claims to recover as a bona fide holder for value.

The partial defense interposed by the defendant, briefly stated, is that there were certain equities existing between the defendant and the Thompson Starrett Company, of which the plaintiff had notice or knowledge when it discounted the notes. The transaction with the Thompson Starrett Company, as a result of which the notes in suit were given, is as follows:

The defendant owned or controlled all the stock and bonds of the North Laramie Land Company, which had constructed irrigation ditches and reservoirs leading from the North Laramie river, at Uva, in the state of Wyoming. This plant had proved to be inadequate, and it became necessary in many ways to alter and enlarge it. The Thompson Starrett Company on August 17, 1911, entered into a contract with the defendant whereby it agreed to do the work for a compensation on the basis of the cost of the work plus 5 per cent. of such cost. It

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was also agreed that statements should be rendered by said company to the defendant, showing the cost of the work at the end of each month, to which should be added 5 per cent. thereof, and that in payment therefor the defendant should give his promissory notes, with interest at 6 per cent. per annum. A preliminary examination of the plant was made and an estimate of cost of $30,000 was given by Thompson Starrett Company's Western manager, and Thompson Starrett Company commenced work. It was found, however, that the ditches would have to be deepened and certain substantial changes made in the dams of the reservoirs, which had not been originally contemplated, and on December 13, 1911, the estimated cost of work was increased to $60,000.

As the work progressed monthly statements were sent to the defendant, and notes maturing May 1, 1912, were given by the defendant, which up to April 21st aggregated $70,992.91. Prior to May 1st the defendant complained to the Thompson Starrett Company of the excessive cost of the work and the unreasonable delays in completion. In the latter part of April Mr. Horowitz, president of the Thompson Starrett Company, and the defendant, met in Chicago, and the defendant stated that he would not pay any of the notes that he had given until he had an opportunity to investigate the charges that had been made for work and materials. But Mr. Horowitz asked the defendant to pay the notes down to $50,000, and renew the latter amount until November 1, 1912, by which time the work would be completed, and the entire matter could be investigated, and if anything was wrong it would be corrected, and an adjustment made, and for the additional work to be done notes should be given maturing November 1st. In pursuance of this understanding the defendant gave a check for $22,-225.10 and made a note for $50,000, payable on or before November 1, 1912. He thereafter gave three notes, maturing November 1, 1912, aggregating $49,828.11. Before giving the second of these, in August, 1912, the defendant told Horowitz that he had learned that Mr. Morton, the defendant's superintendent, supposed to be in charge of the work, had not been on the job, that the man placed in charge was dishonest and incompetent, and that he would give no further notes until he had completed his investigation. But Horowitz stated that he had been severely criticized by the finance committee of the Thompson Starrett Company, and if the notes for the work as it progressed were given he would be relieved from further adverse criticism, and an adjustment would be made as before contemplated, and if anything was wrong it would be made right. Relying on this assurance the defendant gave the note.

In September the defendant had a further interview with Mr. Horowitz, in which he stated that, owing to the fact that the men who had worked on the Uva project had scattered, it would be impossible for the investigation to be completed by November 1st and suggested a renewal of the notes. Horowitz replied that he thought the defendant exaggerated the situation, that the subject-matter of defendant's contract and claims and complaints in connection therewith had already been the subject of discussion in the finance committee, and that he

expected he would have a difficult time securing a renewal of these notes, but, nevertheless, he appreciated that defendant was entitled to ample time for investigation, and if there was anything wrong it should be corrected, and that he was willing to take the matter up with his finance committee. The defendant stated to him that, of course, it must be understood that the renewal notes must be subject to whatever claims and defenses the defendant might have, which should be reserved, so that they could be the subject of adjustment later, and Horowitz replied, "Of course, that was understood," and that if there was anything wrong it would be corrected. In October Mr. Horowitz went to Europe, and shortly prior to his departure the defendant asked him whether he had arranged for the renewal of defendant's notes coming due November 1st. Mr. Horowitz stated that he had; that, as he had told the defendant, he had a very difficult time with his finance committee, but that he had told the finance committee that the defendant should have ample opportunity for investigation and an adjustment of any claims for overcharge or otherwise, and that after great difficulty the finance committee consented to it, and that he would give instructions to the treasurer to accept it. Accordingly the notes in suit were given.

The investigation on the part of the defendant continued, and later the report of the engineer, who made the investigation, was forwarded to Mr. Horowitz. But Mr. Horowitz refused to make any allowance. The evidence discloses: That the defendant originally desired to have his engineer on the work to check up and verify the charges made for work and material. To this Mr. Horowitz objected. That it was understood that Mr. Morton, the manager of the Salt Lake City office of Thompson Starrett Company, was to supervise the work as it progressed. What he did was to employ a superintendent, who had no experience in irrigation work, whose most recent occupation had been that of bawdyhouse keeper, and place him in charge of the work, and employ a "ne'er-do-weel," who had been out of employment for a year, and who is now serving a term in state's prison for embezzlement, and place him in charge of the financial part of the work.

[1] The prosecution of the work was turned over to these two worthies, practically without supervision on the part of Morton, for his visits were limited to one in August, before work had commenced, one in the early part of September, when work was beginning, one in the latter part of October, again on December 11th, and finally on May 27, 1912. It was shown that moneys which were charged against the defendant as having been expended for labor and materials were misappropriated to his own use by the cashier; that camp supplies had been stolen, and the cost of the work actually done had been enormously increased by the incompetence and inattention of the superintendent. I cannot subscribe to the claim of the plaintiff's attorney that in a cost and percentage contract there is no obligation on the part of the contractor to do the work at a reasonable cost, nor responsibility for losses incurred through the inefficiency and incompetency of the men employed, nor for materials stolen, and the cost of the work is the sum that the contractor sent to his agents to be expended, less

only such moneys as the owner can prove were actually embezzled by the employés of the contractor. When a person contracts with a corporation with a reputation for the successful completion of large enterprises to do a work at cost and a percentage, he has the right to expect the same skill and ability to be applied to his work that it would give to a work where its profit was dependent upon its ability to do the work at a cost less than the contract price. Especially is this the case where the contractor has refused to allow the owner to have any supervision over the work and required him to implicitly trust the contractor, and when it has been shown that the work has been done in reckless disregard of this obligation the burden rests upon the contractor to prove that the moneys which he claims to have expended were necessarily paid for materials and work upon the job, making due deductions for expenditures enhanced by the inefficiency and incompetency of his employés. If the contractor fails to do this, he should only be allowed the reasonable cost and his percentage.

At the time Mr. Morton estimated the cost of the entire work at $60,000, he had in his possession data that gave him information as to all the work that had to be done to complete the work, except to the extent of about $2,520. Therefore his estimated cost may be placed at $62,520. De Rohan, an engineer of experience, who was employed in the work in the spring of 1912, gives his estimate of the reasonable cost of labor and materials, $61,341.25; Whiting, an engineer employed by the defendant to lay out the work, and who frequently visited the work in progress, gave his estimate of $62,896.07; Mr. Douglass, an engineer who inspected the work after its completion, gave as his estimate $67,186.14; and Mr. McArthur, who had not visited the work, but had had experience in work in the vicinity, $61,973.96. The two experts called by the plaintiff, Mr. Starrett and Mr. O'Rourke, both gentlemen of great ability and high standing in their profession, have had no experience in irrigation work, had no familiarity with this particular work, nor similar work in the vicinity of this work, took the data overnight and testified to a lump sum, the detailed items of which they could not give. An opinion thus formed has little probative value.

The question naturally suggests itself: Why should the plaintiff rest on expert testimony? It was possible for it to produce the testimony of the men who did the work and expended the money, and could therefore prove the actual cost. In my opinion, the estimate of the men who were present during the progress of the work is of great value. The estimates of Morton, De Rohan, and Whiting are very close. Adopting the highest of these, I find the reasonable value of the work and material $62,896.07. To this should be added 10 per cent. for plant and overhead charges making the cost $69,185.67. To this should be added the 5 per cent., making the total amount earned under the contract $72,644.95. Of this amount the defendant paid upon principal on May 1, 1912, $20,992.91. Crediting this payment would leave a balance due of $51,652.04. On May 1, 1912, the defendant paid as interest $1,232.19, and again as of November 1, 1912, paid the sum of $2,350.15, making a total interest payment of $3,582.34.

If we assume that the monthly statements rendered by the Thomp-

son Starrett Company represent the proportionate amount of work done, then the notes given maturing May 1, 1912, would represent five-sevenths of the entire work. The value of this work would have been $51,889.25, instead of $70,992.91. Two-sevenths of the interest payment, or $352.04, was an overpayment. Reducing the amount due by the payment on account of principal, and adding the remaining two-sevenths of the total value of the work, we find a further overpayment of interest on November 1st of $1,248.48. Allowing interest on these items to November 1, 1913, gives $1,696.23, which, deducted from one year's interest on $51,652.04, leaves a balance due on interest on November 1, 1913, the date when the notes became due and payable, of $1,402.89. I therefore find that on the 1st day of November, 1913, the defendant was indebted to the Thompson Starrett Company in the sum of $53,054.93. Had the notes in suit remained in the possession of the Thompson Starrett Company, they could have been paid and discharged by that sum on their due date.

[2] If the plaintiff is a "holder in due course" of the notes in suit, it is entitled to recover the face value of the notes with interest. If it was not, it can only recover the amount that was actually due thereon. Negotiable Instruments Law, § 97.

"A holder in due course is a holder who has taken the instrument under the following conditions: * * * 3. That he took it in good faith and for value. 4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." Id. § 91.

"The title of a person who negotiates an instrument is defective within the meaning of this chapter * * * when he negotiates it in breach of faith. * * *" Id. § 94.

[3] In the case at bar one thing was established beyond question, and that was that the notes in suit were given, not as an evidence of an indebtedness of a fixed amount, but were given with the distinct understanding that the amount was to be fixed after an investigation into the bona fides of the bills rendered, and were subject to all defenses and claims against the notes. Mr. Horowitz, it is true, in an affidavit made before trial, in an endeavor to prevent the taking of depositions and thus deprive the defendant of an opportunity to present the facts of his defense to the court, stated:

"At no time prior to the negotiation of the promissory notes sued on in this action was any claim made to me, or to Thompson Starrett Company, by the defendant, Max Pam, or by any one in his behalf, that said notes were not in every way valid, subsisting promissory notes, in all respects what they purported to be on their face, and binding on said Max Pam. No claim or intimation whatever was ever made to me, or to Thompson Starrett Company, prior to the negotiation of said notes, that said Max Pam had or claimed to have any defense to said notes, or that he claimed that the title of the Thompson Starrett Company to said instruments was defective, or that said instruments were delivered upon any condition whatsoever. All statements in the moving affidavits upon this motion to the effect that upon the delivery of said notes the above-mentioned defendant expressly reserved all rights and claims against said notes are false and untrue."

On the trial, however, he specifically admitted that the statements were true, after a number of letters were produced from his own files substantiating defendant's contention, among them letters writ-

ten by himself, one to Mr. Morton, on June 25, 1912, in which he stated:

"What I am after now is to get at the exact facts of the situation. If what Mr. Whiting says is true, the company can be charged with being either careless, incapable, or dishonest, or any two or all of these."

Other letters, also written by him, in response to defendant, in regard to such claims, had been produced. Under these conditions the negotiation of the notes was "in breach of faith," and the title to the notes was defective. Negotiable Instruments Law, §§ 91, 94. To negotiate the notes was a fraud on defendant's rights.

"A plaintiff, suing upon a negotiable note or bill, purchased before maturity, is presumed, in the first instance, to be a bona fide holder. But, where the maker has shown that the note was obtained from him by duress, or that he was defrauded of it, the plaintiff will then be required to show under what circumstances and for what value he became the holder. [Citations.] The reason for this rule, given in the later English cases, is that, 'where there is fraud, the presumption is that he who is guilty will part with the note for the purpose of enabling some third party to recover upon it, and such presumption operates against the holder, and it devolves upon him to show that he gave value for it.'" First Nat. Bank v. Green, 43 N. Y. 298, 300.

[4] Under the provisions of the Negotiable Instruments Law it devolves upon him to show, not alone that he gave value, but that he took it in good faith, and that at the time he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it. In accordance with the decision of Merchants' National Bank v. Santa Maria Sugar Co., 162 App. Div. 248, 147 N. Y. Supp. 498, the plaintiff having discounted the notes and placed the avails to the credit of the Thompson Starrett Company, and the latter company having withdrawn thereafter, sums in the aggregate of an equivalent amount, the plaintiff became a holder for value. The burden of proof still rests upon the plaintiff to prove that it had no notice of the defect in title. The plaintiff contends that the burden of proof rests upon the defendant to prove that the plaintiff had notice; that, when it put in evidence the note, the burden of proof shifted to the defendant.

The burden of proof does not shift. It rests with the plaintiff throughout the trial. The burden of going forward, as it is termed by Professor Wigmore, or the burden of the evidence, as it is more happily termed by Mr. Chamberlayne, does shift. When plaintiff put in the note and proved that he gave value, a prima facie case was established by virtue of the presumption of law. The burden of the evidence then shifted to the defendant. When the defendant proved a defect in the title in the Thompson Starrett Company, the burden of the evidence shifted again to the plaintiff to show that it took the notes in good faith, and that, at the time it was negotiated with it, it had no notice of any infirmity in the instrument or defect in the title of the person negotiating it. The burden of proof that it was a holder in due course rested upon the plaintiff at all times. It was requisite for the plaintiff to prove by a fair preponderance of evidence its good faith and lack of notice. The obligation did not rest upon the defendant to prove that the plaintiff was not a bona fide holder and had notice of the defect of title.

[5] The relations of the plaintiff and the Thompson Starrett Company, were not merely those of banker and depositor. When a reorganization of the latter company became advisable, an agreement was entered into under date of March 9, 1903, whereby all the capital stock of the said corporation (10,000 shares, of the par value of $100 each) was to be deposited with the plaintiff, and the plaintiff agreed to procure purchasers for $650,000 of said stock, payment for same to be made in four installments of $162,500 at intervals of two months. Five members of the board of directors out of nine were to be nominated by the plaintiff, and it was expressly provided that the plaintiff should have control of the Thompson Starrett Company. This control was made effective, not alone by the preponderance in the board of directors, but it was also provided that there should be a finance committee of five, of which three should be chosen from the plaintiff's nominees. This committee was to have charge of all the property of the company, and decide upon purchases and sales and the expediency of making contracts, borrowing money, etc. There was also an auditing committee, charged with the duty of auditing the books and examining the assets of the company. There were subsequent changes, a voting trust for five years, and thereafter proxies given to three, two of whom were connected with the plaintiff, so that a practical control of the Thompson Starrett Company was exercised by the plaintiff.

Mr. Kelsey, the president of the plaintiff, was the salaried chairman of the finance committee, and Mr. Stanley, in charge of the plaintiff's banking department, was a member of both the finance and auditing committee. These two men were thus put in positions of commanding influence in the Thompson Starrett Company, and the last amended by-laws vested in the finance committee the control over the president and all other officers of the company. Full statements of the claims to defenses as against the notes, the complaints as to overcharges, the facts that an investigation was being carried on into the alleged overcharges, with the end in view of adjusting the amount actually due, and that there existed an agreement between the Thompson Starrett Company and the defendant that the notes were not an evidence of indebtedness to the amount set forth therein, but a mere means of preserving the status quo until the amount actually due could be ascertained and agreed upon, were all disclosed fully and circumstantially in letters and documents in the files of the company, not promiscuously scattered through, but all collected into one folder and labeled.

The information was at hand, there was opportunity and duty to investigate, and it is hard to believe that these two men did not have actual knowledge of the facts in relation to the notes in suit. There certainly was enough to charge them with knowledge as officers of the Thompson Starrett Company. Can it also be imputed to them as officers of the plaintiff? As we have seen, Mr. Kelsey, as president of the plaintiff, was selected as a director and chairman of the finance committee to represent the plaintiff and those associated with the plaintiff in purchasing the $650,000 of the Thompson Starrett stock. Mr. Stanley, the head of the banking department of the plaintiff, was also chosen to represent these same interests, and was a director, a

member of the finance and auditing committees, as he admitted, largely for the reason that the plaintiff was the banker of the Thompson Starrett Company, and it was important that he should have knowledge of the finances of the Thompson Starrett Company, and of the value and bona fides of the notes that might be offered for discount with the plaintiff. There rested upon them the additional duty to the plaintiff, whom they represented, to keep themselves informed of the very facts, knowledge of which were accessible to them, and which they could escape only by deliberately closing their eyes in violation of their duty to look. Under such circumstances, knowledge is constructively presumed, because men are presumed to do their duty. This would therefore be sufficient, in all probability, to hold the plaintiff chargeable with notice. Ward v. City Trust Co., 117 App. Div. 144, 102 N. Y. Supp. 130, affirmed, 192 N. Y. 61, 84 N. E. 585; Republic Life Ins. Co. v. Hudson Trust Co., 130 App. Div. 618, 115 N. Y. Supp. 503, affirmed 198 N. Y. 590, 92 N. E. 1100.

[6] But it is not necessary to resort to constructive notice, for the evidence convinced me that Mr. Kelsey and Mr. Stanley had actual notice. Mr. Horowitz's acts as president of the company were subject to the supervision of the finance committee. He was ex officio a member of that committee and regularly attended its meetings. We find in the correspondence that Mr. Horowitz stated several times that he was being criticized by the finance committee, and further it was proved that, when the question of the renewal of the notes came up in September, 1912, Horowitz stated that the subject-matter of the defendant's contract and claims and complaints in connection therewith had already been the subject of discussion in the finance committee, and that he expected he would have a difficult time securing a renewal, and later he told the defendant that he had a very difficult time with his finance committee, but that he had told them that the defendant should have ample opportunity for investigation and an adjustment of any claims for overcharge or otherwise, and that after great difficulty the finance committee consented to it. These statements in letters and conversations made at the time, before any action was commenced, accord with what would be naturally and ordinarily done under the circumstances. At this time there could have been no possible motive for Horowitz to conceal this particular transaction from his superiors in the company. It certainly was his duty to apprise the finance committee of a condition which he had stated in a letter to Mr. Morton might result in a loss of $40,000 or $50,000, and to have withheld the facts from them would amount to a fraudulent concealment from those charged with the supervision of his acts and responsible for the financial affairs of the company. These statements, made by him at the time, plaintiff's counsel urges, cannot be received as against the plaintiff, on the theory that they are declarations of the transferror, and not competent to attack the title of the transferee. These were not declarations made subsequent to the devolution of title, but were made prior to the giving of the note, and were a part of the res gestæ.

There is another contemporaneous memorandum that tends to substantiate Horowitz's statement that in September or October he had

disclosed the reasons for the extension of the notes and the fact that loss to the company might result. Shortly after Mr. Horowitz's return from Europe, at a meeting of the finance committee held on November 21, 1912, the following resolution was adopted:

"After discussion as to the best means to keep the finance committee informed with respect to the physical progress being made by the company on work under contract, and more especially as a means of bringing before the committee's attention any subject which is calculated to cause a probable loss to the company, it was decided. * * * "

Furthermore, both Mr. Kelsey and Mr. Stanley testified on examination before trial that they knew of the notes given by Pam in October. They afterwards corrected their testimony, and fixed December 19, 1912, 12 days after the notes were discounted, as the time when they first had knowledge of the fact that Horowitz had accepted notes from Pam. Each one alleged that the reason he changed his testimony was that he had examined the minute book and had thereby refreshed his recollection. Unfortunately there was nothing in the minutes of the committee's meeting of December 19th that refers to the notes or to the work for which they were given. I am led to believe that their recollections were not so refreshed, but were quickened by the fact that between the giving of the first and second testimonies they realized that the admission of knowledge prior to the giving of the notes tended to establish the defense, and that the necessities of plaintiff's case required the change of date.

Mr. Pond, the then treasurer of the company, stated that when he discounted the notes he did not tell Mr. Stanley the amounts of the notes, nor by whom made, but merely stated, "I have to discount," and Mr. Stanley replied, "All right," and he went to a clerk and left the notes. In a transaction of this size, such conduct is more consistent with the previous understanding that these particular notes were to be discounted than with the impression, that was sought to be made, that to these gentlemen a $100,000 transaction was a mere bagatelle. In his affidavit made April 16, 1914, Mr. Pond said:

"At the time of discounting said notes, I stated to said Edward O. Stanley that they were given for a debt due Thompson Starrett Company, and also stated the identity of the maker, Max Pam."

It would extend this opinion to an unreasonable length to refer in detail to the contradictions in the statements made by plaintiff's principal witnesses at different times. These frequent contradictions, the manner in which their testimony was given, their truculency under cross-examination, their breaking out in wholly unwarranted attacks upon the defendant, the policy that was shown in the conduct of the plaintiff in refusing to allow an examination, by the defendant's counsel, of the books and vouchers connected with the work done, after Mr. Boardman, the legal adviser of the Thompson Starrett Company, had consented thereto, the efforts made to prevent the taking of depositions of witnesses for the defense, all tend to substantiate the fact that these notes were discounted with knowledge of the equities existing between the Thompson Starrett Company and the defendant, and that the presumption that, where a note is negotiated in breach

of faith, its negotiation was made for the purpose of allowing some third person to recover on it, in this case is more than a presumption, it is a fact. In contrast, the testimony of the defendant was given in a straightforward manner, and was consistent with and corroborated by the contemporaneous letters and documents.

Where, therefore, his testimony conflicts with the witnesses for the plaintiff, I unhesitatingly accept his testimony. The plaintiff not only has failed to establish by a fair preponderance of the evidence that it was a holder of the notes in due course, but the defendant has established facts tending to prove the contrary. I find that the plaintiff is not a holder of these notes in due course, and is only entitled to recover the amount which was due the Thompson Starrett Company.

[7] The defendant asks to be allowed damages for the delay in the completion of the work. Without passing on the question whether the defendant, as practically the sole owner of the stock and bonds of the North Laramie Land Company, could be allowed to recover for an injury suffered by the company, he cannot be allowed to offset the damages in this case, because the facts constituting such an offset are not pleaded in the answer.

[8] I am of the opinion that the plaintiff is not entitled to interest after November 1, 1913. The amount due was unliquidated, and although the Thompson Starrett Company had the results, before the due date, of the investigation, to make which the extension of time for payment had been made, no effort was made to effect an adjustment, and thus arrive at a liquidated amount. The Thompson Starrett Company had gotten these notes into the hands of a third person, and the third person preferred to rest upon legal technicalities, rather than have an honest and fair adjustment. The responsibility for delay rests, therefore, upon the plaintiff, and not upon the defendant.

Judgment for the plaintiff for the sum of $53,054.93. Requests to find have been passed upon. Settle findings in accordance therewith and with this opinion.