CHARLES M. R. WARD, Appellant, v. CITY TRUST COMPANY OF NEW YORK, Respondent, Impleaded with Another.

1. BILLS, NOTES AND CHECKS — USE OF CORPORATE CHECK BY PRESIDENT OF CORPORATION TO PAY PERSONAL INDEBTEDNESS — PAYEE PUT UPON INQUIRY BY FORM OF CHECK. Where the president of a manufacturing corporation procured a check payable to its order and, having indorsed it in the corporate name by himself as president and general manager, delivered it to a trust company in payment of a personal loan obtained by himself and the secretary-treasurer of the corporation for the purpose of buying the stock thereof, pledged as collateral for such loan, the form of the check was notice to the trust company that such president was using the property of the corporation to pay the personal debt of himself and the secretary-treasurer of the corporation in apparent violation of its rights.

2. SAME — EFFECT OF NOTICE OF IMPROPER USE OF CORPORATE CHECK — PRESUMPTION OF ILLEGAL USE. The effect of such notice was to put the trust company upon inquiry to see whether it was about to accept money from one to whom it did not belong in payment of its own claim, and the presumption arising from the face of the check was that it belonged to the corporation, and that its president had no right to use it to pay his personal debt. The purpose of the law in exacting inquiry under such circumstances is to see whether the apparent situation is the actual situation, or in other words to learn whether facts exist to rebut the presumption; the object is not to discover negative facts, or such as would not arouse suspicion, but positive facts which would allay the suspicion already aroused.

3. SAME — EFFECT OF REASONABLE INQUIRY — REBUTTAL OF PRESUMPTION OF ILLEGAL USE. Assuming that reasonable inquiry had been made by the trust company and the result had tended to show that the check really belonged to the president of such corporation personally and not to the corporation, or that he was authorized by that corporation to use it as he proposed, then, even if the fact were otherwise, such inquiry would have tended to rebut the presumption of illegal use and to protect the title of the trust company; and, even if no inquiry had been

in fact made, to dispel the presumption, but reasonable inquiry would have led to the discovery of facts which would have dispelled it, the trust company would have been entitled to the benefit thereof the same as if it had learned them by proper investigation.

4. CORPORATIONS — RESOLUTION OF BOARD OF DIRECTORS AUTHORIZING PRESIDENT TO TAKE CHARGE OF BUSINESS, AND MAKE AND SIGN CHECKS AND OTHER OBLIGATIONS, DOES NOT WARRANT USE OF CORPORATE PROPERTY TO PAY PERSONAL INDEBTEDNESS. The fact that previous to the use of the check, by such president, to pay the indebtedness mentioned, he had, to the knowledge of the trust company, been authorized by a resolution of the board of directors of the corporation "to take charge of all the property and business of the company" and to make and sign "all checks, notes, contracts and other obligations of the corporation" did not warrant the inference on the part of the trust company that such president was authorized, thereby, to use the check in question to pay his own debts, since such resolution meant that the president of the corporation could do the acts mentioned therein only in transacting the business of the corporation. There was no suggestion of permission to give away the assets of the company or to use them to pay the personal debts of its officers and such a power could not be conferred unless the intention was expressed with the utmost clearness.

5. BILLS, NOTES AND CHECKS — USE OF CORPORATE CHECK BY PRESIDENT OF CORPORATION TO PAY PERSONAL INDEBTEDNESS — PRESUMPTION OF ILLEGALITY — WHEN PAYEE OBTAINS NO TITLE AS AGAINST CORPORATION OR ITS CREDITORS. Where, therefore, in an action to recover from the trust company the amount of the check in question, brought by the assignor of creditors of the corporation after its insolvency, there is no evidence of similar acts or past conduct on the part of the president of the corporation, known to the directors thereof and not objected to by them, from which implied authority might have been inferred, and it appears that no inquiry was made by the trust company as to the authority of such president to use the check for the payment of his personal indebtedness, although it was for so large an amount as to induce a prudent man to proceed with caution; that the trust company had ample opportunity to learn all the facts, as it had representatives on the board of directors of the corporation which was the apparent owner of the check; that had inquiry been made it would have disclosed no fact of any kind to show express or implied authority to dispose of the corporate funds; it must be held that proper inquiry on the part of the trust company would have shown that the president of such corporation did not possess the authority which he assumed to exercise, but on the contrary that he had no such authority, express or implied; so that the presumption against the validity of the transaction remained in full force and hence that the trust company obtained no title to the check as against the corporation or its creditors.

6. SAME — RATIFICATION OF ACTS OF OFFICERS OF CORPORATION — WHEN IT DOES NOT IMPAIR RIGHTS OF CREDITORS OF CORPORATION — GOOD FAITH — ESSENTIAL TO GOOD TITLE.  Although the president and the secretary-treasurer of the manufacturing corporation, for the payment of whose personal debt the check in question was used, owned the stock of the corporation and ratified the transaction, that fact could not affect the rights of the creditors of such corporation, even if it and its stockholders were willing to gave away every right within their power.  It was not enough, therefore, as against the creditors of such corporation, that the trust company parted with value by surrendering the note, given by said president and secretary-treasurer, and the stock pledged as collateral thereto, when it accepted the check in question; it was bound to act in good faith in order to obtain a good title to the check as against the creditors of the corporation.  The presumption was against the transaction, and unless that presumption was overcome by reasonable inquiry, the transaction, unlawful in fact and unlawful on its face, is presumed to have been known to the trust company to be unlawful.  The duty of inquiry extended to all the facts and defects suggested by the form of the check, and hence went beyond the question of authority and included the rights of creditors.

7. SAME — WHEN ACTS OF TRUST COMPANY TAKING CHECK OF CORPORATION IN PAYMENT OF DEBT OF OFFICERS THEREOF NOT IN GOOD FAITH, AS AGAINST CREDITORS OF CORPORATION.  The trust company was charged with knowledge of the law that a corporation, even with the consent of all its stockholders, cannot give away its property, provided there is not enough left to pay its debts.  The form of the check and its amount when compared with that of the capital stock required investigation or inquiry as to the solvency of the company, and where that inquiry, honestly and diligently made, would have shown that the manufacturing corporation was insolvent, or would become so by the withdrawal of so large a part of its capital as the check represented, it cannot be held that the trust company acted in good faith and with no intention to defraud the creditors of the manufacturing corporation.

8. SAME — RIGHTS OF CREDITORS OF INSOLVENT CORPORATION.  Even if the trust company had the right to assume that the said president and secretary-treasurer of the manufacturing corporation, as the sole owners of the stock, could lawfully use the assets of the corporation for their own purposes, still the assumption would necessarily be limited to the corporation itself.  It could not extend to creditors whose rights are supreme and which cannot be sacrificed even by the joint action of all the officers, directors and stockholders of the corporation.

9. WHEN USE BY CREDITORS OF CORPORATION OF STOCK HELD AS COLLATERAL AND SURRENDERED IN CONSIDERATION OF PAYMENT OF CHECK DOES NOT ESTOP THEIR ASSIGNOR FROM MAINTAINING ACTION TO RECOVER AMOUNT OF CHECK FROM PAYEE.  The fact that the stock of the corporation, which was all owned by the president and the secre-

tary-treasurer thereof, was after its redemption by the payment of the check in question used for the purpose of voting an increase in the capital, and transferred to third parties for the benefit of the corporation and its creditors, does not sustain a contention that the plaintiff is not entitled to maintain the action because his assignors in the reorganization of the corporation used new stock thereof issued in place of that surrendered by the defendant in consideration of the transfer of the check, since what was done with the stock by the officers of the corporation after its surrender was done by them as owners and not in any sense by the corporation which did not own it. It was not essential to the contemplated increase of the capital stock of the corporation that the stock should be acquired by it or canceled; hence the surrender of the stock did not inure to the benefit of the corporation in any way.

Ward v. City Trust Co., 117 App. Div. 130, reversed.

(Argued February 27, 1908; decided April 14, 1908.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered January 22, 1907, affirming a judgment in favor of defendants entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Thomas Thacher, Percy S. Dudley, Dwight W. Morrow* and *Millard C. Humstone* for appellant. The City Trust Company having received the money of the Hartman Company in payment of Umsted's debt, is liable to the Hartman Company for the money so unlawfully taken. The appellant, as a judgment creditor of the Hartman Company, whose execution has been returned unsatisfied, has a right to reach this claim of the Hartman Company. (*Stetson* v. *Hopper*, 60 App. Div. 277; Code Civ. Pro. §§ 1871, 1873; *Gerard* v. *McCormick*, 130 N. Y. 261; *Rochester & C. T. R. Co.* v. *Paviour*, 164 N. Y. 281; *Cohnfeld* v. *Tanenbaun*, 176 N. Y. 126; *F. Nat. Bank* v. *Nat. Broadway Bank*, 156 N. Y. 459; *Rankin* v. *C. Nat. Bank*, 188 U. S. 557; *Orr* v. *S. A. T. C. Co.*, 113 App. Div. 103; *Nat. Bank of Newport* v. *Snyder Mfg. Co.*, 107 App. Div. 95; *Ludington* v. *M. Nat. Bank*, 102 App. Div. 251; 182 N. Y. 522; *S. & G. T. R. Co.* v. *Craver*, 45 Penn. St. 386.) Apart from the question of the rights of the

Hartman Company itself, the transfer of the $125,000 to the City Trust Company was void as to creditors of the Hartman Company. (*Hurd* v. *N. Y. & C. S. L. Co.*, 167 N. Y. 89; *G. S. V. & T. Co.* v. *Boynton*, 71 Fed. Rep. 797; *Matter of P. W. Mills*, 126 Fed. Rep. 1011; *Nat. Trust Co.* v. *Miller*, 33 N. J. Eq. 155; *Hamor* v. *T. R. E. Co.*, 84 Fed. Rep. 392; *Matter of Haas Co.*, 131 Fed. Rep. 232; *Cole* v. *M. I. Co.*, 133 N. Y. 164; *Wilson* v. *Æolian Co.*, 170 N. Y. 618; 64 App. Div. 337; *Halpin* v. *M. B. Co.*, 20 App. Div. 583; *Mott* v. *Edwards*, 98 App. Div. 511.)

*Morgan J. O'Brien*, *Albert B. Boardman* and *Henry W. Clark* for respondent. The proceeds of the check cannot be recovered upon the theory that its transfer was fraudulent as to the creditors of the Hartman Company. (*Cole* v. *M. I. Co.*, 133 N. Y. 164; *Parker* v. *Conner*, 93 N. Y. 118; *Cheever* v. *P., etc., R. R. Co.*, 150 N. Y. 59; *Fulweiler* v. *Hughes*, 17 Penn. St. 440; *Frazer* v. *Western*, 1 Barb. Ch. 220; *Yardley* v. *Torr*, 67 Fed. Rep. 857; *Hollins* v. *B. C. & I. Co.*, 150 U. S. 371; *G. S. V. & T. Co.* v. *Boynton*, 7 Fed. Rep. 797; *Hurd* v. *N. Y. & C. S. L. Co.*, 167 N. Y. 89; *Wilson* v. *Æolian Co.*, 170 N. Y. 618.) Appellant cannot succeed by virtue of a property right in the Hartman Company to the proceeds of the check. No cause of action exists in favor of the Hartman Company against respondent. (*Martin* v. *N. F. P. Mfg. Co.*, 122 N. Y. 165; *Little* v. *Garabrant*, 90 Hun, 404; *Elyea* v. *L. S. M. Co.*, 169 N. Y. 29; *Osborn* v. *Montelac Park*, 89 Hun, 167; 153 N. Y. 672; *Hoyt* v. *Thompson*, 19 N. Y. 207; *Hall* v. *Herter Bros.*, 90 Hun, 280; 157 N. Y. 694; *Kent* v. *Q. M. Co.*, 78 N. Y. 159; *Q. D. Co.* v. *Plaut*, 55 App. Div. 87; *S. E. L. Co.* v. *Chatham Nat. Bank*, 52 Hun, 575; *Groh's Sons* v. *Groh*, 80 App. Div. 85.) Appellant, as the representative of creditors, is not equitably entitled to prosecute this action, because of the appropriation and use by the creditors of the stock of the Hartman Company surrendered by respondent and the consequent impossibility of restoring respondent to its former position. (*R. L.*

*Co.* v. *Parker Co.*, 135 N. Y. 209; *Ostrander* v. *Hart*, 130 N. Y. 406; *Palmer* v. *Cypress Hill*, 122 N. Y. 429; *Ogden* v. *Alexander*, 140 N. Y. 356; *Dyke* v. *Spargur*, 143 N. Y. 651; *L. Assur. Corp.* v. *Thompson*, 170 N. Y. 94; *Ward* v. *Hasbrouck*, 169 N. Y. 407; *Scott* v. *Morgan*, 94 N. Y. 508, 515; *Hooper* v. *Beecher*, 109 N. Y. 609; *Matter of Levy*, 91 App. Div. 482; 179 N. Y. 603.)

VANN, J. In March, 1901, Frank A. Umsted, but recently a salesman in the employ of the Hartman Manufacturing Company, a Pennsylvania corporation, and William L. Kiefer, a lawyer, borrowed $125,000 of the defendant, the City Trust Company, a New York corporation, in their own names and for their own benefit. They had previously arranged to purchase the entire capital stock of the Hartman Company of the face value of $250,000 for $110,000, and they used enough of the proceeds of the loan to pay for such stock, which they pledged as collateral to their promissory note given to secure the loan. The trust company knew that the bulk of the money was to be used to pay for the stock, although it believed that the purchase price was much larger. The interest reserved was at the rate of fourteen per cent a year and a commission of over $5,000 was paid in addition. As a condition of the loan, which was procured by misrepresentation and fraud on the part of Umsted and Kiefer, Chapman, a director, and Plummer, a representative of the trust company, were elected directors of the Hartman Company to look after the interests of the former until the loan should be paid. At the same time Umsted was elected president and Kiefer secretary and treasurer. No part of the proceeds of the loan was turned over to the Hartman Company or used for its benefit, nor was any representation made that it was procured, or was to be used in its behalf.

The period of credit was six months, and about sixty days before it expired, Umsted and Kiefer applied to the trust company for another loan which was refused, but consent was given to the payment of the note before maturity.

Thereupon, Umsted, on the second of August, 1901, falsely representing that the loan from the City Trust Company for $125,000 "had been made for the Hartman Company," procured a loan for the latter from the Hanover Bank of $200,000, which was secured by the promissory note of the Hartman Company, indorsed by Umsted and Kiefer, and the certificates of all the stock of the Hartman Company were pledged as collateral. In paying over the proceeds of that loan the Hanover Bank delivered to Umsted, at his request, to enable him to pay the loan to the trust company and redeem the certificates of stock, its check for $125,000, payable to the order of the Hartman Manufacturing Company and placed the balance of $75,000 to the credit of that company on its books. Umsted indorsed the check in the name of the Hartman Manufacturing Company by himself as president and general manager and delivered it to the City Trust Company in payment of the note made by himself and Kiefer. The Hartman Company received no consideration for the use made by Umsted of said check. The note, as well as the certificates of stock pledged as collateral thereto, were surrendered to Umsted. The money lent was out of the possession of the trust company only from March 27th until August 2d, so that the interest actually received was at the rate of more than twenty per cent per annum.

At the time of this transaction Umsted, as president of the Hartman Company, had been authorized by a resolution of the board of directors "to take charge of all the property and business of the company" and to make and sign "all checks, notes, contracts and other obligations of the corporation." After adopting said resolution the directors held no further meetings until after all rights involved in this action had become fixed and unchangeable. Umsted transacted all the business of the company. There was no by-law of the Hartman Company, nor any resolution of its board of directors, authorizing the use of its money or assets to pay other than corporate obligations, or ratifying the use made of said check.

Between three and four months after the check had been

so used the Hartman Company failed, and all its property, except its alleged right to recover from the City Trust Company said sum of $125,000, was sold at the instance of a reorganization committee composed of creditors, and the proceeds, amounting to $238,000, applied proportionately upon its debts, leaving still unpaid the sum of $371,140.29. The remaining claims of the various creditors were assigned to the plaintiff, who recovered judgment against the Hartman Company for the amount thereof and an execution issued thereon was returned unsatisfied. Said judgment is wholly unpaid. Of that indebtedness the sum of $226,840.62 was in existence on the 2d of August, 1901, and prior to the date of the withdrawal from the assets of the Hartman Manufacturing Company of said sum of $125,000 used to pay the debt of Umsted and Kiefer to the City Trust Company for that amount. That withdrawal made the Hartman Company insolvent, and the object of this action was to recover from the trust company the sum thus misappropriated.

The referee before whom the action was tried, after finding the foregoing facts in substance, further found that the trust company acted in good faith, with no intent to hinder, delay or defraud the creditors of the Hartman Company; that the form of the cashier's check was notice to the trust company that the money represented thereby was the property of the Hartman Company; that the trust company, knowing that Umsted and Kiefer owned all the capital stock of the Hartman Company, and believing that they were authorized to dispose of said check, made no inquiry as to the authority of Umsted as president and general manager to use the same in payment of the individual debt of himself and Kiefer, or as to the financial condition of the Hartman Company, or whether the effect of the withdrawal of $125,000 from its assets would make it insolvent; that if reasonable inquiry had been made it would have disclosed the said resolution of the board of directors, that no meeting of the board had since been held, and that Umsted, after the passage thereof, had had the exclusive control of the business of the company.

It was also found that the law of Pennsylvania is the same as the law of New York in the respect that the amount of the assets of a corporation over and above its liabilities are in equity a trust fund held by the corporation for the benefit of creditors; that so far as the rights of creditors are concerned in this case there is no difference between the law of New York and the law of Pennsylvania and that by the law of the latter state the directors of an insolvent corporation may authorize a sale of all or any of its assets without authority from the stockholders thereof.

The referee found as conclusions of law that the trust company was a *bona fide* holder for value of said check for $125,000; that it obtained a good title thereto as against the Hartman Company and its creditors, and that the plaintiff is not estopped to maintain this action by the use made by the reorganization committee of the certificates of capital stock of the Hartman Company. The complaint was dismissed on the merits, with costs.

Upon appeal to the Appellate Division the judgment was affirmed by a divided vote upon the opinion of the referee, which, together with the dissenting opinion of Mr. Justice SCOTT, concurred in by Mr. Justice McLAUGHLIN, may be found reported in 117 App. Div. 130. Reference is made to those opinions for a more detailed statement of the facts, which were fully found and clearly stated.

The main question presented for decision is whether the facts found, when all are considered together, support the conclusions of law. The form of the check in question was notice to the trust company that Umsted was using the property of the corporation of which he was president, to pay the personal debt of himself and Kiefer in apparent violation of its rights. (*Rochester & Charlotte Turnpike Road Company* v. *Paviour*, 164 N. Y. 281; *Gerard* v. *McCormick*, 130 N. Y. 261; *Hathaway* v. *County of Delaware*, 185 N. Y. 368, 372.) The effect of such notice was to put the trust company upon inquiry to see whether it was about to accept money from one to whom it did not belong in payment of its own claim. The

presumption arising from the face of the check was that it belonged to the Hartman Company and that its president had no right to use it to pay his personal debt.   The purpose of the law in exacting inquiry under such circumstances, is to see whether the apparent situation is the actual situation, or in other words to learn whether facts exist to rebut the presumption. The object is not to discover negative facts, or such as would not arouse suspicion, but positive facts which would allay the suspicion already aroused.   If, for instance, reasonable inquiry had been made by the trust company and the result had tended to show that the check really belonged to Umsted and Kiefer and not to the Hartman Company, or that Umsted was authorized by that company to use it as he proposed, then, even if the fact were otherwise, such inquiry would have tended to rebut the presumption of illegal use and to protect the title of the trust company.   The law goes further than this in order to promote the transfer of commercial paper, for it is settled that if no inquiry is in fact made to dispel the presumption, but reasonable inquiry would have led to the discovery of facts which would have dispelled it, the purchaser of the paper is entitled to the benefit thereof the same as if he had learned them by proper investigation.   ( *Wilson* v. *Metro. Elev. Ry. Co.*, 120 N. Y. 145, 153.)   This benefit, however, carries with it the burden of responsibility for such unfavorable facts as reasonable inquiry would have discovered in relation to the defect that made the inquiry necessary. (*Cohnfeld* v. *Tanenbaum*, 176 N. Y. 126, 130 ; *Rochester & Charlotte Turnpike Road Co.* v. *Paviour*, 164 N. Y. 281, 286 ; *Seger* v. *Farmers' Loan & Trust Co.*, 187 N. Y. 314, 319.)

In the case before us no inquiry was made, although the check was for so large an amount as to induce a prudent man to proceed with caution.   The transaction upon its face involved a gift to Umsted and Kiefer, or the theft by them, of a large portion of the assets of the Hartman Company, and under such extraordinary circumstances reasonable inquiry meant one prosecuted with a degree of diligence

adapted to those circumstances. Inquiry of Umsted and Kiefer would not have satisfied the requirement, for it was apparent that they were acting in their own interest and, hence, beyond the general scope of their authority. (*Bank of New York National Banking Association* v. *American Dock & Trust Co.,* 143 N. Y. 559, 564.) The trust company had ample opportunity to learn all the facts, for it had representatives on the board of directors of the Hartman Company, the apparent owner of the check. According to the custom of business men and especially of banks, the first inquiry would have called for a resolution of the board of directors authorizing Umsted to use the check to pay his own debts. The minute book of the board was open to examination by the representatives of the trust company, but when examined it would have shown no such authority, for the resolution relied upon, broad as it was, simply authorized Umsted as president to take charge of the property and business of the company and to sign checks, notes and other obligations in its behalf. This meant that he could do these acts only in transacting the business of the company, for no other construction would be reasonable. There was no suggestion of permission to give away the assets of the company or to use them to pay the personal debts of its officers. Such dangerous power, which might involve the ruin of the company, cannot be conferred unless the intention is expressed with the utmost clearness. " If such a power is intended to be given it must be expressed in language so plain that no other interpretation can rationally be given it, for it is against the general law of reason that an agent should be intrusted with power to act for his principal and for himself at the same time." (*Bank of New York Nat. Banking Assn.* v. *Am. Dock & Trust Co.,* 143 N. Y. 559, 564.)

The next inquiry would naturally have been whether Umsted had implied authority, to be inferred from similar acts and past conduct known to the directors of the corporation and not objected to by them, but that inquiry would have

disclosed nothing to rebut the presumption. There is no evidence that Umsted, before his misappropriation of the check in question, had ever used the property of the corporation he represented to pay his own debts or otherwise than in the transaction of its business. No fact of any kind would have been discovered, because none existed, to show authority, express or implied, and the presumption would, therefore, have stood in full force. While inquiry would have discovered that Umsted had full power to act for the corporation in all its corporate business, it would not have shown that he had the right, either real or apparent, to use the check in question in payment of the debt owing by himself and Kiefer to the trust company. If an officer of that company " had made the inquiry he would have learned the facts already stated. He is, therefore, chargeable with all that these facts import or which is fairly to be inferred from them." (*Cohnfeld* v. *Tanenbaum*, 176 N. Y. 126, 130.)

If the check had been regular on its face, that is, if it appeared to have passed through the hands of the Hartman Company, and thence into the channels of commerce, as in a case relied upon by the respondent, then, even if offered in payment of his personal debt by one of the officers of the company, the taker without notice would have the right to assume that the relations of the various parties to the paper were what they appeared to be. (*Cheever* v. *Pittsburgh, Shenango & Lake Erie R. R. Co.*, 150 N. Y. 59, 66.) The case before us, however, is utterly different, for the check showed on its face that it did not belong to Umsted or Kiefer, but to the Hartman Company. As was said in the *Paviour Case* (*supra*): " There was a shadow on the checks, and the defendant could not, in good faith, accept them until it disappeared. By accepting them he did an act which he had reason to believe would affect the rights of a third party, and he could not, in justice to that party, ignore the suspicions which the facts should have aroused. One who suspects, or ought to suspect, is bound to inquire, and the law presumes that he knows whatever proper inquiry would disclose.

While the courts are careful to guard the interests of commerce by protecting the negotiation of commercial paper, they are also careful to guard against fraud by defeating titles taken in bad faith, or with knowledge, actual or imputed, which amounts to bad faith, when regarded from a commercial standpoint."

According to the facts found by the referee, when all are read together, we think that proper inquiry by the trust company, or its officers, would not have shown that Umsted possessed the authority which he assumed to exercise, but on the contrary, that he had no such authority, either express or implied.

Thus far we have confined the discussion to the rights of the Hartman Company and to the authority, or want of authority, of its president to use the check for his own benefit. The rights of creditors, however, were also involved, for the Hartman Company was insolvent, yet the transaction on its face indicated a gift by that company to Umsted and Kiefer of $125,000, or precisely one-half of its capital as it stood at the time. While Umsted and Kiefer owned all the stock and Kiefer ratified whatever Umsted did, still the rights of creditors remained, even if the corporation and its stockholders were ready to give away every right within their power. (*Hurd* v. *N. Y. & Com'l Steam Laundry Co.*, 167 N. Y. 89, 95; *Cole* v. *Millerton Iron Co.*, 133 N. Y. 164, 168.) It was not enough for the trust company to part with value by surrendering the note and collateral, for it was bound to act in good faith in order to get good title. (Negotiable Instruments Law, §§ 91, 94 and 95.) Bad faith in taking commercial paper does not necessarily involve furtive motives, for it exists when the purchaser has notice of facts which, if unexplained, would show that he was taking the property of one who, to quote again from *Paviour* case, " owed him nothing, in payment of a claim that he held against some one else. * * * Even if his actual good faith is not questioned, if the facts known to him should have led him to inquire, and by inquiry he would have discovered the real situation, in a

commercial sense he acted in bad faith and the law will withhold from him the protection that it would otherwise extend."

The trust company had notice that apparently it was dealing with a donee, who had no title to the check as against creditors, or with a thief, who had no title as against any one. It knew the Hartman Company was a heavy borrower and that there were creditors with large claims. It knew the enormous rate of interest that these men had promised to pay when they procured the loan, as well as the payment by them of about $5,000 in addition as a commission to Plummer, its representative, who aided the borrowers in procuring the loan. It knew through Chapman and Plummer, with whose knowledge it was charged, that the company was heavily involved.

The presumption was against the transaction, and, as we have seen, unless that presumption was overcome by reasonable inquiry, the transaction, unlawful in fact and unlawful on its face, is presumed to have been known to the trust company to be unlawful. The duty of inquiry extended to all the facts and defects suggested by the form of the check, and hence went beyond the question of authority and included the rights of creditors. As was well said in the dissenting opinion below, to which we are greatly indebted : " Primarily, the capital of a corporation is held for the protection of its creditors and is impressed with a trust in their behalf, and the directors cannot lawfully, nor can the stockholders divert the funds of a corporation to the individual use of its members, if thereby the capital is impaired and the corporation rendered insolvent." (*Hurd* v. *N. Y. & Com'l Steam Laundry Co.,* 167 N. Y. 89 ; *Germania Safety Vault & Trust Co.* v. *Boynton,* 71 Fed. Rep. 797 ; *Matter of Prospect Worsted Mills,* 126 id. 1011 ; *National Trust Co.* v. *Miller,* 33 N. J. Eq. 155.) To these carefully selected authorities cited by Mr. Justice SCOTT there may properly be added the pioneer case in this state, *Bartlett* v. *Drew* (57 N. Y. 587). The trust company was charged with knowledge of the law that a corporation, even with the consent of all its stockholders, cannot give away its property, provided there is not enough left to pay its debts.

The form of the check and its amount when compared with that of the capital stock required investigation or inquiry as to the solvency of the company. That inquiry, honestly and diligently made, would have shown that the Hartman Company was insolvent, or would become so by the withdrawal of so large a part of its capital as the check represented. Even if, as the learned referee held, although erroneously as we think, the trust company had the right to assume that Umsted and Kiefer, as the sole owners of the stock, could lawfully use the assets of the corporation for their own purposes, still the assumption would necessarily be limited to the corporation itself. It could not extend to creditors whose rights are supreme and which cannot be sacrificed even by the joint action of all the officers, directors and stockholders of the corporation. We do not need to consider the rights of "future creditors," for the claims of "existing creditors" exceed in amount the sum misappropriated.

The learned counsel for the respondent contends that the plaintiff, although a creditor armed with judgment recovered and execution unsatisfied, is not entitled to maintain this action because the creditors, who are his assignors, used new stock of the Hartman Company, issued in place of that surrendered to Umsted, to reorganize that corporation and another, the capital stock of which it had purchased.

This contention was properly overruled by the referee and we adopt his reasons for such action, which we quote from his opinion : " Nor can I find, as urged by the learned counsel for the defendant, that the subsequent use of the stock in being voted upon for the purpose of an increase of the capital, or its being transferred to a third party for the benefit of the creditors or of the corporation through the intervention of Mr. Chapman after it was discovered that the corporation was in bad financial condition, or its subsequent transfer to the receiver of the corporation for its benefit, in any way operates to make this surrender of the stock to Umsted and Kiefer a purchase by the corporation, or to estop in any way the plaintiff from maintaining this action if otherwise he could main-

tain it. What was done with the stock after it was delivered to Umsted and Kiefer was done by them as owners and not in any sense by the corporation. The final surrender of Umsted's interest in the stock seems to have been in consideration of a release of a claim of the creditors against his wife in respect to other property. These questions, however, like many other questions of fact and law that were fully and ably discussed on the trial and summing up of the case are not material to the disposition of the main issues in the case, as I understand them."

The stock that was pledged to secure the note of the City Trust Company, and to redeem which the check for $125,000 was paid, was not the property of the Hartman Company. The company did not own its own stock but it was owned by the two stockholders who had borrowed the money from the trust company and in no respect was it essential to the contemplated increase of the capital stock of the corporation that the pledged stock should be acquired by the Hartman Company or canceled. Hence the surrender of the stock did not inure to the benefit of the Hartman Company in any way.

The finding of fact made by the referee that the trust company acted in good faith and with no intention to defraud the creditors of the Hartman Company, when considered with his other findings, is inconsistent therewith and the appellant is entitled to rely upon those most favorable to himself. (*City of Buffalo* v. *Del., L. & W. R. R. Co.*, 190 N. Y. 84, 98.)

As thus construed the facts found do not warrant the conclusion of law that the complaint should be dismissed. We are, therefore, constrained to reverse the judgments below and order a new trial, with costs to the appellant to abide event.

H<small>AIGHT</small>, J. (dissenting). The Hartman Manufacturing Company was incorporated under the laws of the state of Pennsylvania with a capital stock of $250,000, consisting of $100,000 of preferred stock and $150,000 of common stock. In the spring of 1901 Frank A. Umsted purchased from the

owners all of the capital stock for the sum of $110,000. Thereupon he arranged with William L. Kiefer, a lawyer, to take a third interest therein, and together they applied to and obtained a loan of $125,000 from the defendant, the City Trust Company, upon their promissory note, payable in six months, secured by a pledge of the certificates representing the entire capital stock of the company. To induce the trust company to make the loan, it was represented by Umsted and Kiefer that the loan was desired to enable them to pay the balance due from them to the persons from whom they had purchased the stock, the price of which was $350,000 ; that there were no claims, liens or incumbrances against the property of the company and that the cash assets, consisting of bills receivable, cash, open accounts, raw materials and unfinished stock, exceeded the total liabilities by at least $40,000 ; that the business was very prosperous and that dividends had been paid on the stock of the company ranging from fourteen to twenty-three per cent per annum, the dividend for the last year having been nineteen per cent. After acquiring the stock of the company Umsted was elected its president, and by resolution he was placed in charge of the property of the corporation and made the general manager thereof, and all checks, notes, contracts and other obligations of the corporation were required to be made and signed by the president or by the secretary and treasurer. On the second day of August thereafter Umsted applied to the Hanover National Bank for a loan to the Hartman Company of $200,000 to be secured by the promissory note of that company indorsed by himself and Kiefer, and in making such application he stated to the Hanover National Bank, for the purpose of procuring the loan, that the Hartman Company needed additional banking credit for the character and extent of the business ; that it desired to enlarge its business and increase its capital stock ; that Kiefer and he had borrowed of the City Trust Company $125,000 for the Hartman Company on their promissory note secured by a pledge of the capital stock of the company, and he asked the Hanover

National Bank to give him as a part of said loan a cashier's check for $125,000 with which to pay said loan at the trust company. Thereupon the Hanover National Bank made a loan in accordance with the offer and delivered a cashier's check to Umsted for $125,000, with which Umsted went to the City Trust Company, indorsed the same and delivered it to the trust company in payment of the loan made by that company to himself and Kiefer and procured a surrender to him of all of the stock of the corporation which the trust company held as security for the loan. This payment was made with the knowledge and consent of Kiefer, who, in writing, approved of the payment out of the loan made by the Hanover National Bank, and inasmuch as Umsted and Kiefer were then the owners of all of the stock of the corporation, it follows that the payment was made with the consent and approval of all the stockholders. This, to my mind, disposes of all of the questions raised and discussed with reference to the authority of Umsted to make the payment in question. His authority was, in effect, the same as if he had been expressly authorized so to do at a meeting of the board of directors. It, consequently, follows that the question remaining for consideration pertains to the rights of the creditors of the corporation existing at that time. As to such creditors we have the representations made by Umsted and Kiefer to the trust company, at the time the $125,000 was borrowed, the financial condition of the Hartman Company, its prosperity, earnings and dividends declared, to which attention has already been called, and the further fact that so far as the Hanover National Bank is concerned, it was expressly informed at the time the application for the loan was made that it was for the purpose in part of enabling Umsted and Kiefer to take up their promissory note and the stock pledged by them for its payment, to the end that they might enlarge the business of the company and increase its capital stock, and that the loan from the trust company was made by Umsted and Kiefer upon their personal promissory note. The findings are to the effect that the City

Trust Company believed these representations to be true at the time it made the loan to Umsted and Kiefer and that it had no knowledge that the company had subsequently become insolvent, and that in accepting the cashier's check of the Hanover National Bank in payment for the note held by it and the surrender thereupon of the stock of the company, it acted in good faith, and, consequently, became a *bona fide* holder of the cashier's check for value.

Again, this is an equitable action, brought for the purpose of obtaining purely equitable relief, in which the plaintiff demands the payment to him by the trust company of the $125,000 received by it through the payment of the cashier's check of the Hanover National Bank. It appears from the findings that, after the trust company had surrendered the capital stock of the Hartman Company to Umsted and Kiefer upon the payment of its promissory note, Umsted and Kiefer procured an increase of the capital stock to be made from $250,000 to $2,500,000, and that they had purchased the property of the Shelby Steel Tube Company at Newcastle, Penn., at a cost of $80,000, which was less than its real value and had also purchased the entire capital stock of the Cuyahoga Steel and Wire Company for $250,000, on which they had paid the sum of $125,000 and had expended a large sum of money in substituting new machinery in the plants purchased. It further appears that after trouble had arisen with reference to meeting the obligations of the corporation as they matured and became due, a meeting of the creditors was held and at such meeting a committee of such creditors was appointed, consisting of William Logan of the Hanover National Bank and others, to reorganize the Hartman Company and the Cuyahoga Steel and Wire Company and that, thereupon, at the request of the committee, Umsted and Kiefer transferred all of the capital stock of the Hartman Company to the persons designated by the committee, and such new stockholders, in the interests of the committee of the creditors, authorized a sale of the property of the corporation, other than the claim

now in suit, and that the same was bought in by the plaintiff in this action, to whom the claims of these creditors had been previously assigned, for the sum of $238,000. It thus appears that, by reason of the transfer of the stock of the corporation to the committee appointed by the creditors, they were enabled to vote the stock, elect new directors and control and manage the affairs of the company. They were enabled not only to direct the sale of the property, but also to prescribe the terms of the sale and arrange for its transfer to their own assignee, deriving therefrom a material and substantial benefit to themselves, thereby depriving the trust company of the protection that it otherwise would have had, had it still held and controlled the stock of the corporation. To hold that these creditors, including the Hanover National Bank, whose claims are represented by the plaintiff, may now recover from the defendant the amount of this claim, after they have reaped the benefit derived from the control of the stock of the corporation, which had been surrendered by the trust company, would, to my mind, be most inequitable and unjust.

I, therefore, favor an affirmance of the judgment.

CULLEN, Ch. J., WERNER, HISCOCK and CHASE, JJ., concur with VANN, J.; GRAY, J., concurs with HAIGHT, J.

Judgments reversed, etc.