MUTUAL TRUST COMPANY, Respondent, *v.* THE MERCHANTS NATIONAL BANK OF THE CITY OF NEW YORK and Another, Appellants.

First Department, February 9, 1923.

Conversion — action to recover money fraudulently given by officers of plaintiff to defendant in payment of personal debt of vice-president of plaintiff — evidence establishes that defendant had full knowledge that money was being so applied — defendants liable.

In an action to recover a sum of money, on the theory that the defendants were guilty of conversion in that they wrongfully obtained possession of a certain check and converted the same and the proceeds to the use of the defendant

bank, a judgment in favor of the plaintiff should be affirmed, where the evidence establishes that an officer of the defendant bank, with full knowledge of the facts, accepted a check from an officer of the plaintiff to be applied in part payment of the personal obligation of a vice-president of the plaintiff and that the proceeds of said check were so applied, and that at the time the check was so given the plaintiff was not then or subsequently indebted to said vice-president or the defendants, and that the right to make said payment was not conferred by the plaintiff upon its officers by any corporate act nor was it ever legally ratified.

APPEAL by the defendants, The Merchants National Bank of the City of New York and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 9th day of March, 1921, upon the verdict of a jury rendered by direction of the court, and also from an order entered in said clerk's office on the 17th day of February, 1922, denying defendants' motion for a new trial made upon the minutes.

*Zabriskie, Sage, Kerr & Gray* [*George Zabriskie* of counsel; *William E. Sims* with him on the brief], for the appellants.

*Edward F. Clark* of counsel [*Leonard J. Reynolds* with him on the brief], for the respondent.

DOWLING, J.:

This action is brought to recover the sum of $30,700, with interest, on the theory that defendants were guilty of conversion in that they " wrongfully obtained possession " of a certain check for $90,000 under the circumstances hereinafter set forth, and " wrongfully took, disposed of and converted the same and the proceeds thereof to the defendant bank's own use, to the plaintiff's damage in the sum of $90,000." Plaintiff admits that it has received on account of its alleged damages the sum of $39,300, with interest, from the National Newark Banking Company, and the further sum of $20,000, without interest, leaving the balance of $30,700, to recover which the suit was commenced.

The following facts appear substantially without dispute: Plaintiff (hereinafter called the Trust Company) is a trust company located at Orange, N. J. In the year 1916 its officers were a president, Charles R. Wilmot; three vice-presidents, of whom one was Edwin H. Hatch; and a secretary and treasurer, Thomas S. Byrne. These five officials, with another person, were its directors. Its capital stock was $100,000, whereof sixty-one per cent was owned by Hatch.

Defendant, The Merchants National Bank of the City of New York (hereinafter called the Bank) was a National bank carrying on business in the city of New York, and the defendant Joseph M.

Byrne was its cashier. It has since become consolidated with the Bank of the Manhattan Company.

The two Byrnes were not in any way connected, either in business or by relationship.

On November 30, 1914, Hatch, who had been and then was a borrower from defendant bank, executed and delivered to the bank a general continuing collateral loan agreement which it retained. This agreement provided, among other things, in effect, that the Bank should have a general lien upon all collateral for all the borrower's indebtedness, and contained appropriate provisions for sale of collateral upon default of the debtor. It is described as " a continuing agreement applying to all future as well as to any existing transactions between the undersigned and the Bank."

On May 5, 1915, the Bank loaned to Hatch $100,000, and as collateral Hatch deposited a certificate of deposit of the National Newark Banking Company.

On May 10, 1916, the Bank made another loan of $100,000 to Hatch and received as collateral another certificate of deposit for $100,000 of the National Newark Banking Company. Other loans had been made to Hatch by the Bank, so that at the time of the transactions in suit he owed it between $300,000 and $400,000, all secured by collateral.

On May 19, 1916, Hatch deposited $34,000 with the plaintiff in six sums of $5,000 each and one of $4,000, and there were issued to him in the name of plaintiff six certificates of deposit for $50,000 each and one for $40,000 in the following form:

" CERTIFICATE                                        No. 313
        OF          MUTUAL TRUST COMPANY          $50,000
    DEPOSIT
                              " ORANGE, N. J., *May* 19, 1916.
    " Edwin H. Hatch has deposited in this Bank
Not subject
    to check      Fifty thousand 00/000..............Dollars
        payable to the order of Self in current funds on the return
of this Certificate properly endorsed.
Interest 3 per cent. per annum if left..............months.
                                   " T. S. BYRNE, *Treas.*"

It is not charged and does not appear that any of these certificates came into the hands of the defendant Bank, or that they were in any way connected with the plaintiff's claim, or that the Bank had any knowledge of them. The charge is that prior to July, 1916, said Hatch, with the connivance of said T. Stephen Byrne, had caused funds of plaintiff to be used unlawfully for his benefit,

and had converted same; and defendants, on and prior to July 19, 1916, were aware of that fact. There is some proof that defendant Byrne knew that these fraudulent certificates had been issued.

On June 2, 1916, Hatch sold to the plaintiff 1,400 shares of Pacific Gas and Electric old preferred stock at ninety and interest, amounting to $126,766.66, for which the plaintiff paid by check of the same date.

On June 27, 1916, Hatch withdrew the certificate of deposit from the collateral to his loan of May 5, 1915, and in place of it substituted 1,000 shares of Pacific Gas and Electric preferred stock and other collateral: 100 shares Mutual Trust Company, and 300 shares Submarine Boat Company.

He also withdrew the certificate of deposit for $100,000 of the National Newark Banking Company collateral to his loan of May 10, 1916, and substituted in place of it 800 shares of Pacific Gas and Electric preferred, besides other collateral. The certificates were in Hatch's name.

On June 28, 1916, defendant Bank received a letter from Hatch dated June twenty-seventh, reciting that on his loan of May 5, 1915, for $100,000 he had deposited 1,000 shares of Pacific Gas and Electric preferred, and on his loan of May 10, 1916, for $100,000 he had deposited 800 shares of Pacific Gas and Electric preferred; that 1,400 shares of this was in his name and 400 shares in the name of Charles R. Wilmot; and he requested in compliance with a circular inclosed that the stock be sent forward to the company at San Francisco to be exchanged for first preferred stock of the Pacific Gas and Electric Company, stating that he wished 1,400 shares to be issued in his name and 400 shares in Wilmot's name. The bank immediately sent the certificates for preferred stock to their correspondent in San Francisco, the Anglo and London Paris National Bank, and afterwards received the new certificates for first preferred stock from them.

On July 1, 1916, the plaintiff sold to Hatch the 1,400 shares of Pacific Gas and Electric stock at 90 and interest, in all $126,766.66.

On July 11, 1916, the plaintiff repurchased from Hatch the 1,400 shares of Pacific Gas and Electric stock for $127,656.66.

The defendant Bank had no notice that the stock did not belong all the time to Hatch. Joseph Byrne had no idea that it was not his. It does not appear that Hatch disclosed to the plaintiff, when he sold the stock, that it was pledged to the defendant. T. S. Byrne testified that he did not know it.

A few days (perhaps three or four) before July eighteenth, Mr. Hatch called up Joseph Byrne at the Crescent Athletic Club at Bay Ridge, where he was residing, and asked if he would return

the Pacific Gas and Electric stock against a trust receipt. Byrne told him that he would not, that the bank never did such a thing, and if he wanted to take that stock out of his loan, he would have to substitute other collateral that would be acceptable or else pay the loan. He said he would pay the loan, and would send Mrs. Hatch to the bank at the opening of business with a check for $100,000. About ten o'clock on the same morning Mrs. Hatch called upon him at the bank with a check for $100,000 and asked him to give her the Pacific Gas and Electric new preferred stock. Byrne said that he could not give it to her because it was in transit from San Francisco to New York, and had not yet been received by the Bank. She then asked him to go out with her and see her husband, which he did, and found Mr. Hatch in bed. Hatch told him that he had just returned from the hospital that morning. Byrne told Hatch that he had a little anxiety about his affairs, and rehearsed what had previously happened that morning, and said that he would like to know if everything was straight and all his transactions correct. Hatch said that they were, but that his affairs were involved by reason of an unexpected operation for appendicitis which had laid him on his back and made it impossible for him to attend to his affairs. He assured Byrne that everything was all right, and that as soon as he got up he would put his affairs in proper shape. He said he was anxious to get this stock, and asked Byrne to do everything he could to facilitate the delivery of it to him.

On July 17, 1916, the bank examiner came in to examine the Mutual Trust Company.

On July 18, 1916, a meeting took place in Hatch's bedroom in his house at Maplewood, in the evening. There were present Mr. Hatch, who was still in bed from the effects of his operation; Mrs. Hatch; Walter Van Dusen, the cashier of the National Newark Banking Company; Charles R. Wilmot, the president of the Mutual Trust Company; Thomas S. Byrne, its treasurer; S. W. Baldwin, a director; and Joseph Byrne. During the conversation a real estate man, H. R. O'Brien, who had been waiting downstairs, was asked to come up. Hatch's lawyer was also present, but he does not appear to have taken any part in the conversation. Defendant Byrne had requested Wilmot and Baldwin to attend the meeting, calling them up on the telephone for that purpose. Defendant Byrne knew before this meeting that the bank examiners were in the plaintiff's place of business, having been so informed by Hatch; and he had told Hatch that he had " a little anxiety " about the latter's affairs.

The officers of the Trust Company had previously been informed

that the 1,400 shares of Pacific Gas and Electric stock were pledged with the defendant Bank by Mr. Hatch, and they were anxious to get it into the hands of the Trust Company so that the examiners should not find it missing. Mrs. Hatch, on behalf of her husband, invited Joseph Byrne to attend the meeting for the purpose of finding out the terms on which the Bank would give up the stock; and in answer to Hatch's question he said they could only deliver it upon payment of $120,000.

All through the conference defendant Byrne says he " had no idea that the stock was not Mr. Hatch's," and did not know it when he left there; he admitted that Hatch wanted the stock in the Bank, but thought it might have been, among other reasons, to " sweeten up his loan " from plaintiff.

He further testified: " Q. When Mr. Hatch told you this did he say anything about being in some danger personally from such examination? A. Well, as I recall the conversation it was something like this: He told me that he had this condition which necessitated an operation, a sudden development. He had an operation for appendicitis, and it came on very suddenly. He told me he was unable to arrange his business affairs for that reason, and that he was switching around some of his collateral, and he wanted to secure the Pacific Gas and Electric Company stock from us."

He was questioned by the trial court and answered as follows: " The Court: Were you apprehensive as to your loans? The Witness: No, sir, I thought we were well secured. The Court: Weren't you apprehensive as to the conditions? Didn't you as a banking man take any suspicion as to all these dealings, that there was something radically wrong somewhere? The Witness: I was suspicious that there was, and that was the very reason that I did not participate, or charge myself with the knowledge of what was going on. I was not interested. I did not want to know. The Court: If you were suspicious, wouldn't you at least have enough curiosity to find out what was the matter? The Witness: Well, I did not want to know. I preferred not to have anything to do with it."

It is further proven that at the said conference, defendant Byrne stated that upon receiving the checks to be sent to the defendant Bank, he would send to the Trust Company a letter stating that the certificates for the 1,400 shares of Pacific Gas and Electric Company stock were *en route*, having been sent to San Francisco for transfer, and that he would return them to the Trust Company immediately upon receiving them from San Francisco. This letter defendant Byrne said was to be for the benefit of the bank examiners.

It was arranged, at this conference, between the officers of the Trust Company, that the Trust Company should send a check for $90,000 to the Bank the next morning, and that the remaining $30,000 should be supplied by Hatch. T. S. Byrne suggested that the examiners would see the $90,000 check, and would question about it; whereupon Van Dusen advised, in the presence of Joseph Byrne, that it should be taken out near the end of the check book; and this was done. The last check drawn in regular order was 125; this one was numbered 494, and was on the next to last page of the check book.

The amount to be paid on the loan for the release of the collateral was fixed between Hatch and Joseph Byrne. Up to the time he left the meeting the latter, although he was present and heard more or less of the conversation with regard to raising the money, testified that he did not know how the money was to be obtained, or whether Hatch would be able to raise it. There is testimony that at the meeting defendant Byrne asked Baldwin how many people knew of the fraudulent certificates of deposit having been issued, and was told; also that all present knew that the Trust Company was insolvent.

At the same meeting it was settled, apparently upon Van Dusen's advice, between Hatch and the other officers of the Trust Company, that Hatch should transfer to the Trust Company 780 shares of the stock of the Boyertown Ore Company, which he valued at about sixty-five ($50,700), but which he had bought two years before at $5 a share, but which Hatch claimed was worth sixty-five because of the probability of an option of purchase being exercised; and a second mortgage on his residence at Maplewood for $39,300, which together would cover the Trust Company's check for $90,000. Defendant Byrne emphasized the value of the mortgage, recommending it because of his personal knowledge of real estate values there.

This arrangement was carried out. These securities were retained by the Trust Company and came into the possession of the liquidator who collected the mortgage, but has realized nothing on the ore stock.

On July 19, 1916, the Bank received a letter from Hatch (drafted for his convenience the night before by J. Byrne) requesting it to accept payment of $120,000 on account of his indebtedness from (blank), and to release from his collateral 1,400 shares of Pacific Gas and Electric preferred stock, and to hold it on special deposit for account of the Mutual Trust Company. The letter was accompanied by a remittance of $120,000, of which a check for $90,000 dated July 19, 1916, drawn by the plaintiff, on the National

First Department, February, 1923.          [Vol. 204

Newark Banking Company and certified by the drawee, being the check in suit, was a part, besides other checks. The object for which the Trust Company's check was drawn was to get the certificates of stock.

On the same day T. S. Byrne, for the Trust Company, instructed the Bank by telephone to forward the stock certificates by registered mail, insured for $100,000, to the Trust Company, and confirmed the instructions by letter of the same date, received by the Bank the next day. The certificates were received by the Bank from San Francisco on the nineteenth, and were sent to plaintiff on the same day, with a letter under a separate inclosure, signed by defendant Byrne as cashier, which made no reference to its having been held as collateral for any loan, but simply referred to it as " registered in the name of Edwin H. Hatch, which we have received from San Francisco in exchange for the old stock. We enclose herewith power of attorney executed by Mr. Hatch assigning this stock in blank." The certificates were received by T. S. Byrne, who placed them in the Trust Company's vault. The Trust Company's check for $90,000 was paid through the Clearing House.

Of the $120,000 received by the Bank, $50,000 was applied on account of Hatch's loan of May 5, 1915, and $70,000 on account of his loan of May 10, 1916.

On July 24, 1916, the Trust Company was closed and La Rue Vredenburgh was put in charge as liquidator by the State Banking Commissioner.

There is no evidence that, on or before July nineteenth, Hatch was insolvent. He was in prison at the time of the trial, having been convicted apparently for his participation in the issue of the false certificates and the book entries in connection therewith. At the time of these transactions in July, 1916, the defendant Bank held altogether 400 shares of the capital stock of the Trust Company, that is to say, forty per cent of the entire stock, as collateral for some of the Hatch loans. At the time of putting up a part of this as collateral (June 27, 1916) Hatch put a valuation of 180 on it, at which rate the amount of the collateral for Hatch's loans held by defendant Bank in the form of stock of the Trust Company was $72,000.

When the Trust Company was closed on July 24, 1916, although liable to it for the fraudulent over-issuance of the certificates of deposit to the extent of at least $306,000, Hatch had balances to his credit in his three deposit accounts with the Trust Company of only $2,888.81, $6,188.68, and $1,468.19, respectively, and his balances on July eighteenth were substantially the same.

On January 3, 1917, the Commissioner of Banking and Insurance

of the State of New Jersey, on behalf of the Mutual Trust Company, demanded of the defendant Bank the return of $90,000 received by it July 19, 1916. The bank did not comply with the demand. No demand seems to have been made upon the defendant Joseph Byrne.

The Pacific stock was sold by the liquidator for the same price the Trust Company paid for it, realizing about $126,000.

It does not appear that the plaintiff tendered the Boyertown stock or the Maplewood mortgage to Hatch, or otherwise disaffirmed the transaction between them. On the contrary, the plaintiff collected the mortgage and retained the stock.

Concededly, in all his transactions in this matter, defendant Byrne acted in behalf of the Bank and not for any private purpose of his own.

The theory of the complaint, in support of which the proof was alleged, was that Hatch, vice-president and director of plaintiff, on July 19, 1916, was indebted to the defendant Bank in excess of $90,000, and at the same time held a majority of the plaintiff's stock, and was in control of plaintiff, and plaintiff's directors and officers were his nominees and under his control to the knowledge of the defendants; that prior to that date, Hatch, with the connivance of T. Stephen Byrne, plaintiff's treasurer, had converted funds of the plaintiff, to the knowledge of the defendants; that at the same time Hatch was insolvent and unable to pay his debt to the Bank, and has ever since been, and is now, insolvent and bankrupt, and the defendants knew that he was insolvent and unable to pay his debt.

Further that plaintiff was not then, or subsequently, indebted to Hatch or to the defendants; that plaintiff's officers had no right or authority to draw or deliver the check in question, or to appropriate the plaintiff's funds towards the payment or satisfaction of Hatch's indebtedness to the Bank, or any other use of Hatch, of which facts the defendants had notice; that the making of the check was procured by Hatch and the defendants for the purpose of being delivered to the Bank as part payment of Hatch's personal indebtedness, and it was so delivered on July 19, 1916, and the Bank took and appropriated the check and credited the amount thereof on account of Hatch's individual indebtedness; that the defendant Joseph Byrne as cashier of the Bank procured the making of the said check by Wilmot, the president, and T. Stephen Byrne, the treasurer of the plaintiff, and he knew that the making and delivery of the check was unauthorized and unlawful, and in violation of the duty of Wilmot and Byrne as officers of the plaintiff; that on or about July nineteenth, defendants

presented the check to the drawee for certification and it was certified, and on July twentieth the check was paid by the drawee and charged to plaintiff's account and the Bank received the proceeds and used them toward the payment of Hatch's debt.

At the conclusion of the plaintiff's case the defendants moved to dismiss the complaint. The court denied the motion and the defendants excepted.

At the conclusion of the whole case the defendants moved to dismiss the complaint on the ground that the plaintiff has not made out a cause of action, and further moved for an instruction to the jury to return a verdict for the defendants. The plaintiff also moved for a direction of a verdict in its favor. The court directed a verdict for the plaintiff and the defendants excepted. The defendants did not request the submission of any question of fact to the jury.

The defendants moved to set aside the verdict and for a new trial on the ground that the verdict was against the evidence, and the weight of the evidence, and on all the grounds specified in section 999 of the Code of Civil Procedure.* The motion was denied.

As defendant Joseph Byrne represented the defendant Bank and was acting solely in its interest, the transaction reduced to its essentials is as follows: Hatch, an officer, director and owner of sixty-one per cent of the stock of the trust company, had pledged with the Bank to secure his personal loans, certain collateral, including 1,800 shares of preferred stock of the Pacific Gas and Electric Company, whereof 1,400 shares stood in his name and 400 in the name of Charles R. Wilmot. The 1,400 shares of this stock standing in his name he had in fact sold to the Trust Company for $127,656.66, without disclosing to it that the stock was in fact pledged to the Bank, and without disclosing to the latter that it had been sold by him to the Trust Company. On this stock with other collateral, therefore, the Bank held a valid lien to secure loans to Hatch amounting to $200,000. Hatch had requested the Bank to send the 1,800 shares of stock to San Francisco to the Pacific Company's office to be exchanged for new first preferred stock thereof, whereof 1,400 shares were to be issued in his name and 400 in that of Wilmot (the president of the Trust Company). While the stock was on its way, Hatch in a telephone talk with Joseph Byrne, endeavored to get possession of the stock by giving a trust receipt, but the latter refused, and Hatch said he would send his wife next day with a check for $100,000. He did in fact send

---

* Now Civ. Prac. Act, § 549, and § 575 in part.— [REP.

her with such a check, but the stock could not be delivered, being in transit from San Francisco to New York. Thereupon she asked Joseph Byrne to call on her husband, who was ill in bed. He did so. Hatch told him his affairs were involved because of his illness and expressed anxiety about the stock and asked Byrne to do all he could to facilitate its delivery. Byrne expressed anxiety about Hatch's affairs, spoke of the telephone call and the wife's visit and asked him if everything was straight and his transactions correct, which Hatch assured him was the case. Within a day or two a bank examiner was at work on the Trust Company's books. Joseph Byrne knew this when he went to the meeting of July eighteenth at Hatch's home. He was active in the meeting, requested two of the directors of the Trust Company to come to it, participated in the discussions and discussed the terms on which his bank would release the Pacific stock from Hatch's loan, fixing the amount to be paid at $120,000. He then knew the Trust Company was insolvent, that an examination of its affairs by the State examiner was under way, and that fraudulent certificates of deposit had been issued by it. He inquired as to who knew of this fraud and was told, the officers of the Trust Company, N. W. Halsey & Co. and their counsel. He knew the extreme and unusual anxiety of Hatch, manifested for some days, to get possession of the Pacific stock. He had no apprehension as to the loans to Hatch from his bank, thinking them well secured. He admits that he was suspicious that there was something radically wrong, and for that reason he says he did not participate in or charge himself with knowledge of what was going on; he testified twice he " did not want to know; " he " preferred not to have anything to do with it." Yet the preponderance of the testimony is, that he was an active participant in planning the way by which the Pacific stock was to be freed from the loan and returned to Hatch who wanted so badly to turn it over to the Trust Company. Believing that the stock belonged to Hatch, it must have occurred to him that some strong reason existed for Hatch's desire to get it into the possession of the Trust Company; he testified that he thought Hatch wanted to " sweeten his loan " from the latter. Having fixed the amount to be paid the Bank to release the stock at $120,000, he was present when it was agreed that this should be paid, $30,000 by Hatch and $90,000 by the Trust Company, though he claims that when he left at eleven-thirty P. M. he did not know if Hatch would be able to raise the money. But there is evidence that Joseph Byrne discussed all the details and the method by which the $120,000 was to be raised at this conference, which lasted at least an hour. He participated in the discussion as to how the $90,000

should be made good to the Trust Company by Hatch, and vouched for the second mortgage suggested by the latter as being good, based on his own former residence in Maplewood where the property covered by it was located. He was present when Van Dusen suggested that, in order that the bank examiners might not see the check and ask questions about it, it should be taken out near the back of the book. Upon this record it must be held that Joseph Byrne on behalf of his bank was an active participant in this conference, the result of whose deliberations was a scheme by which $90,000 of the Trust Company's funds were used to pay Hatch's personal debt.

It cannot be claimed that this conference was an official meeting of the directors of the Trust Company, nor in fact was any meeting ever thereafter held to ratify or adopt such action as was there agreed on. It was a purely voluntary assemblage for the purpose of endeavoring to save Hatch from the exposure of his unlawful operations. Though the defendant Bank's principal concern was the repayment of as much as possible of its loan to Hatch, and though it was interested in the solvency of the Trust Company, forty per cent of whose stock it held as collateral on Hatch's loans, it went beyond any mere attempt to protect its lien on the Pacific stock and entered into a scheme whose natural result was to mulct the Trust Company. Even though the Trust Company got the Pacific stock, it was its property, having already paid Hatch the full value thereof, and his sole concern in getting it back into the Trust Company's vaults was to prevent the bank examiners from detecting another crime on his part. There is no direct proof that Joseph Byrne knew anything of the specific transaction between Hatch and the Trust Company, but he had to admit his suspicions were aroused.

The secrecy and concealment attending this conference and the desire to help Hatch were manifested again when Joseph Byrne as cashier returned the new Pacific stock to the Trust Company, but made no reference to the fact that it, or the old stock for which it was substituted, had ever been pledged as collateral by Hatch with the Bank.

It seems to me that in the last analysis this resolves itself into a transaction by which the money of the Trust Company was taken in part payment of a personal debt of its vice-president to the Bank, with the full knowledge of the Bank that it was being so applied. The transaction is now called simply a redemption of plaintiff's property from defendant's lien thereupon, for value paid. But this was not the transaction the parties to it intended, or what they accomplished. The Bank believed it had a lien

upon Hatch's own stock, for loans made to him. It became a party to a scheme by which plaintiff's money was used to pay Hatch's debt. That, as a result thereof, the Trust Company in fact regained possession of its own property, is a fact of which the Bank had no intimation when it entered into the plan to accommodate Hatch while receiving part of its debt from him. In view of the knowledge which upon the proven facts herein is chargeable to the Bank, it accepted a check of the Trust Company to pay the personal debt of its vice-president, and it cannot be contended that the right to make such payment had been conferred by any corporate act, or was ever legally ratified. (See *Ward* v. *City Trust Co.*, 192 N. Y. 61.) Upon the undisputed facts, and such as must be taken as found in view of the directed verdict, the defendants were guilty of conversion.

The judgment and order appealed from should, therefore, be affirmed, with costs.

CLARKE, P. J., SMITH, PAGE and MERRELL, JJ., concur.

Judgment and order affirmed, with costs.